**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 25, 2002**

TERESA COX, as a Next Friend of
BRANDON COX, a Minor, TERESA COX
and CAREY COX, Individually,

    Plaintiff-Appellees,

v                                      No. 118110

BOARD OF HOSPITAL MANAGERS FOR
THE CITY OF FLINT doing business
as HURLEY MEDICAL CENTER, a Municipal
Corporation,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, C.J.

    In this medical malpractice case, we consider two issues: 1) whether a court may instruct a jury that it may find a hospital vicariously liable for the negligence of a "unit" of the hospital, and 2) whether MCL 600.2912a sets forth the standard of care for nurses in malpractice actions and, if so, which standard applies.

We hold that vicarious liability may not be premised on the negligence of a "unit" of a hospital and that substantial justice requires reversal. The "unit" instruction relieved plaintiffs of their burden of proof and did not provide the jury with sufficient guidance. For a hospital to be held liable on a vicarious liability theory, the jury must be instructed regarding the specific agents of the hospital against whom negligence is alleged and the standard of care applicable to each agent.

Further, we hold that the plain language of MCL 600.2912a does not prescribe the standard of care for nurses because they do not engage in the practice of medicine. Absent a statutory standard, the common-law standard of care applies. Under the common-law standard of care, nurses are held to the skill and care ordinarily possessed and exercised by practitioners of their profession in the same or similar localities.

## I
### FACTUAL BACKGROUND AND PROCEDURAL POSTURE

On February 8, 1990, Brandon Cox was born at 26 or 27 weeks gestation, weighing approximately 900 grams. He was placed in the neonatal intensive care unit (NICU) of defendant hospital, and an umbilical arterial catheter (UAC) was inserted into his abdomen to monitor his blood gases, among other uses. At 4:00 p.m. on February 10, Nurse Martha

2

Plamondon drew blood from the UAC and repositioned Brandon. At 4:20 p.m., it was discovered that the UAC had become dislodged, causing Brandon to bleed from his umbilical artery and lose approximately half his blood supply. No cardiac or respiratory alarm sounded. The events that followed are in dispute. Nurse Plamondon testified that she immediately applied pressure to stop the bleeding and summoned Dr. Robert Villegas, who ordered a push of 20cc of Plasmanate. Dr. Villegas did not recall the event. Nurse Plamondon also testified that she paged Dr. Amy Sheeder, a resident in the NICU. Dr. Sheeder ordered another 10cc of Plasmanate and 20cc of packed red blood cells. On February 11, Brandon was transferred to Children's Hospital. On February 13, a cranial ultrasound showed that Brandon had suffered intracranial bleeding. He was subsequently diagnosed with cerebral palsy as well as mild mental retardation.

In 1992, plaintiffs filed this medical malpractice action against defendant and one of its doctors, Dr. Edilberto Moreno.[1] Plaintiffs presented expert testimony at trial that Nurse Plamondon and others had breached the applicable standard of care. Defendant offered expert testimony supporting a contrary view. Defendants argued that plaintiffs

---

[1]The parties stipulated to dismiss Dr. Moreno before trial.

could not prove that the removal of the UAC caused Brandon's injuries, as the injuries were not uncommon for infants born at 26 or 27 weeks' gestation. The judge ruled, over defense objection, that a "national" standard of care applies to nurses and the other individuals alleged to have been negligent.

The jury found in favor of plaintiffs and awarded $2,400,000 in damages. Defendant moved for judgment notwithstanding the verdict, a new trial, or remittitur. The trial court found that little evidence of causation existed and ruled that it would grant a new trial unless plaintiffs accepted remittitur to $475,000. Plaintiffs appealed, and the Court of Appeals ordered the trial court to produce a detailed opinion indicating the basis for remittitur.[2] On remand, the trial court reversed the prior grant of remittitur and granted a judgment notwithstanding the verdict in favor of defendant, holding that plaintiff had failed to establish negligence on the part of any particular nurse or doctor.

Again plaintiffs appealed, and the Court of Appeals reversed and reinstated the original jury verdict.[3] The Court held that sufficient circumstantial evidence of negligence

---

[2]Unpublished order, entered December 14, 1994 (Docket No. 179366).

[3]Unpublished opinion per curiam, issued November 22, 1996 (Docket No. 184859).

existed and that defendant had not preserved its arguments by filing a cross-appeal. Defendant then filed a cross-appeal, which was dismissed because defendant had not submitted a copy of the circuit court order. The circuit court then vacated the order granting judgment notwithstanding the verdict and reinstated the jury verdict. Defendant appealed, and the Court of Appeals held, over a dissent, that defendant's appellate issues were not preserved because it had failed to file a cross-appeal from the original circuit court order.[4]

Defendant appealed to this Court. We vacated the decision of the Court of Appeals and remanded for consideration of defendant's issues.[5] On remand, the Court of Appeals again affirmed, over a dissent, in a published decision.[6] Defendant filed an application for leave to appeal to this Court. We denied leave to appeal.[7] We then granted defendant's motion for reconsideration and granted leave to appeal.[8]

---

[4]Unpublished opinion per curiam, issued April 6, 1999 (Docket No. 205025).

[5]462 Mich 859; 613 NW2d 719 (2000).

[6]243 Mich App 72; 620 NW2d 859 (2000).

[7]464 Mich 877; 630 NW2d 625 (2001).

[8]465 Mich 943; 639 NW2d 805 (2002).

## II
### Jury Instruction

### A
### Standard of Review

We review claims of instructional error de novo. Jury instructions should include "all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). Instructional error warrants reversal if the error "resulted in such unfair prejudice to the complaining party that the failure to vacate the jury verdict would be 'inconsistent with substantial justice.'" *Johnson v Corbet*, 423 Mich 304, 327; 377 NW2d 713 (1985); MCR 2.613(A).

### B
### Discussion

We hold that the trial court improperly modified SJI2d 30.01 by substituting "hospital neonatal intensive care unit" for the specific profession or specialties at issue. Further, we hold that the error requires reversal because failure to do so would be inconsistent with substantial justice.

When the trial judge discussed the jury instructions with the parties, he indicated that he would phrase SJI2d 30.01 "in [his] own way."[9] The judge stated:

---

[9]Unmodified, SJI2d 30.01 provides:

6

Well, I'm going to indicate that with respect to Defendant's conduct, the failure to do something which a hospital with a neonatal intensive care unit would do or would not do. That's the way I'm going to phrase this.

Defendant objected, requesting that the instructions state the standard of care "with regard to a neonatal nurse practitioner[10] of ordinary learning or judgment or skill in this community or similar one." Defense counsel contended that the case had focused on Nurse Plamondon and her responsibility regarding the UAC and was not as broad as the entire unit. The judge overruled defendant's objection.

When he instructed the jury, the judge significantly

When I use the words "professional negligence" or "malpractice" with respect to the defendant's conduct, I mean the failure to do something which a [name profession] of ordinary learning, judgment or skill in [this community or a similar one/ name particular specialty] would do, or the doing of something which a [name profession] of ordinary learning, judgment or skill would not do, under the same or similar circumstances you find to exist in this case.

It is for you to decide, based upon the evidence, what the ordinary [name profession] of ordinary learning, judgment or skill would do or not do under the same or similar circumstances.

[10]No evidence in the record suggests that Nurse Plamondon was a "nurse practitioner," which is a specialized term used in nursing that refers to a registered nurse who receives advanced training and is qualified to undertake some of the duties and responsibilities formerly assumed only by a physician. See *Merriam-Webster's Collegiate Dictionary*. The only evidence presented at trial indicated that Nurse Plamondon was a registered nurse.

modified SJI2d 30.01, stating:

> When I use the words professional negligence or malpractice with respect to the Defendant's conduct, I mean the failure to do something which a hospital neonatal intensive care unit would do or the doing of something which a hospital neonatal intensive care unit would not do under the same or similar circumstances you find to exist in this case.
>
> It is for you to decide, based upon the evidence, what the hospital neonatal intensive care unit with the learning, judgment or skill of its people would do or would not do under the same or similar circumstances.

In other words, the jury instruction as modified eliminated any reference to any particular profession, person, or specialty, substituting instead the phrase "neonatal intensive care unit." The modified jury instruction also failed to differentiate between the various standards of care applicable to different professions and specialties.

The plaintiff in a medical malpractice action "bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Failure to prove any one of these elements is fatal." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995). Crucial to any medical malpractice claim "is whether it is alleged that the negligence occurred within the course of a professional relationship." *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 45; 594 NW2d 455 (1999), citing *Bronson v*

8

*Sisters of Mercy Health Corp*, 175 Mich App 647, 652; 438 NW2d 276 (1989).  A hospital may be 1) directly liable for malpractice, through claims of negligence in supervision of staff physicians as well as selection and retention of medical staff, or 2) vicariously liable for the negligence of its agents.  *Id*; *Theophelis v Lansing Gen Hosp*, 430 Mich 473, 478, n 3; 424 NW2d 478 (1988) (opinion by Griffin, J.).  Here, plaintiffs have not advanced claims of direct negligence on the part of defendant hospital.  Therefore, defendant's liability must rest on a theory of vicarious liability.[11]  *Id.* at 480.

Vicarious liability is "indirect responsibility imposed by operation of law."  *Id.* at 483.  As this Court stated in 1871:

> [T]he master is bound to keep his servants within their proper bounds, and is responsible if he does not.  *The law contemplates that their acts are his acts, and that he is constructively present at them all.* [*Smith v Webster*, 23 Mich 298, 299-300 (1871) (emphasis added).]

In other words, the principal "is only liable because the law creates a practical identity with his [agents], so that he is held to have done what they have done."  *Id.* at 300.  See also *Ducre v Sparrow-Kroll Lumber Co*, 168 Mich 49, 52; 133 NW 938

---

[11]Although plaintiffs' first amended complaint contains numerous charges of direct negligence by defendant hospital, they offered no evidence of direct negligence at trial.

(1911).

Applying this analysis, defendant hospital can be held vicariously liable for the negligence of its employees and agents only. The "neonatal intensive care unit" is neither an employee nor an agent of defendant. At most, it is an organizational subsection of the hospital, a geographic location within the hospital where neonates needing intensive care are treated. No evidence in the record suggests that the neonatal intensive care unit acts independently or shoulders any independent responsibilities. Therefore, because no evidence exists that the neonatal intensive care unit itself is capable of any independent actions, including negligence, it follows that the unit itself could not be the basis for defendant's vicarious liability.

The negligence of the agents working in the unit, however, could provide a basis for vicarious liability, provided plaintiffs met their burden of proving (1) the applicable standard of care, (2) breach of that standard, (3) injury, and (4) proximate causation between the alleged breach and the injury *with respect to each agent alleged to have been negligent*. The phrase "neonatal intensive care unit" is not mere shorthand for the individuals in that unit; rather, plaintiffs must prove the negligence of at least one agent of the hospital to give rise to vicarious liability. Instructing

10

the jury that it must only find the "unit" negligent relieves plaintiffs of their burden of proof. Such an instruction allows the jury to find defendant vicariously liable without specifying which employee or agent had caused the injury by breaching the applicable standard of care.[12]

On this point, we agree with the Court of Appeals decision in *Tobin v Providence Hosp*, 244 Mich App 626; 624 NW2d 548 (2001). In *Tobin*, the trial court refused to modify SJI2d 30.01 to require the jury to determine whether each individual category of specialist who attended the decedent had violated the standard of care applicable to that specialty. Instead, the trial court instructed:

> When I use the words "professional negligence"
> or "malpractice" with respect to the defendant's
> conduct, I mean the failure to do something which a

---

[12]Contrary to the dissent's assertions, our holding does not increase plaintiffs' burden or insulate defendants from liability. Rather, our holding merely requires plaintiffs to establish which agent committed the negligence for which the principal is liable as required by agency principles and medical malpractice law. The dissent observes that no authority directly addresses the "unit" instruction given here, but our analysis is well-grounded in undisputed agency principles. The dissent acknowledges that a plaintiff must show that an agent of the hospital committed malpractice but provides no authority for its conclusion that a "unit" is considered an agent of a hospital. Further, the dissent cites no authority for its assertion that plaintiffs who are unable to establish which professional is negligent are somehow relieved of the requirement of proving a violation of the relevant standard of care by the particular agent for whom the hospital is to be held vicariously liable. No principle of law provides that plaintiffs are required to prove every element of their case unless is it "too difficult" to do so.

11

hospital's agents/servants/employees of ordinary
learning, judgment or skill in this community or a
similar one would do, or the doing of something
which a hospital's agents/servants/employees of
ordinary learning, judgment or skill would not do,
under the same or similar circumstances you find to
exist in this case.

It is for you to decide, based upon the
evidence, what the ordinary hospital's
agents/servants/employees or [sic, of] ordinary
learning, judgment or skill would do or would not
do under the same or similar circumstances. [*Id.* at
672.]

The Court of Appeals found that the refusal to modify was

error, stating:

The unmodified standard instruction, under the
circumstances of this case, was not specific
enough; it permitted the jury to find that, for
example, the nurse anesthetist violated the
standard of care applicable to a critical care unit
physician. The standard instruction is sufficient
to inform the jury of the definitions of
"professional negligence" and "malpractice" in the
ordinary case involving one or two named
defendants. However, in this case plaintiff chose
to bring suit against the hospital and its
(unnamed) agents, servants, or employees. Thus, it
was incumbent on the trial court to ensure that the
jurors clearly understood how they were to
determine whether any of defendant's employees
committed professional negligence or malpractice
under the particular standard of practice
applicable to their specialty. The unmodified
standard instruction did not fulfill that function.
[*Id.* at 673.]

Similarly, in this case, plaintiffs did not name any

specific agents of the hospital in their lawsuit at the time

12

of trial.[13]  Dr. Carolyn S. Crawford, an expert witness for plaintiffs, criticized the care of several agents of defendant, including a neonatologist, a respiratory therapist, a resident, and Nurse Plamondon.[14]  The trial court's "unit" instruction did not specify the agents involved, nor did it ensure that the jurors understood the applicable standards of care.  The respiratory therapist, for example, may not be held to the standard of care of the neonatologist. The "unit" instruction failed to ensure that the jury clearly understood 1) which agents were involved, and 2) that it could find professional negligence or malpractice only on the basis of the particular standard of care applicable to each employee's profession or specialty.[15]

---

[13]Originally, the suit named Dr. Moreno, but the parties stipulated to his dismissal before trial.

[14]Justice Markman correctly observes that much of the evidence at trial focused on Nurse Plamondon, but plaintiffs presented evidence that other individuals were negligent as well. In fact, the trial court ruled that the "unit" instruction was proper because plaintiffs' case included evidence that individuals other than Nurse Plamondon were negligent.  Further, plaintiffs did not argue at trial that the res ipsa loquitur doctrine applied.  Because evidence of negligence on the part of several individuals was presented, we cannot ascertain which individual the jury found to have been negligent.  For this reason, the error was not harmless.

[15]Plaintiffs did not present evidence regarding every member of defendant's NICU; therefore, the dissent's assertions that every member of the NICU is a specialist and had a provider-patient relationship with Brandon are pure speculation.

We hold that, in order to find a hospital liable on a vicarious liability theory, the jury must be instructed regarding the specific agents against whom negligence is alleged and the standard of care applicable to each agent. As stated above, a hospital's vicarious liability arises because the hospital is held to have done what its agents have done. Here, the general "unit" instruction failed to specify which agents were involved or differentiate between the varying standards of care applicable to those agents. The instruction effectively relieved plaintiffs of their burden of proof and was not specific enough to allow the jury to "decide the case intelligently, fairly, and impartially." *Johnson*, *supra* at 327. Under these circumstances, failure to reverse would be inconsistent with substantial justice.

III
STANDARD OF CARE

Although we have already held that the erroneous "unit" instruction requires reversal, we will also address the applicable standard of care for nurses to provide guidance on remand.

A
STANDARD OF REVIEW

This issue requires an interpretation of MCL 600.2912a. Questions of statutory interpretation are reviewed de novo. *Oade v Jackson Nat'l Life Ins Co*, 465 Mich 244, 250; 632 NW2d

14

126 (2001).[16]

## B
### DISCUSSION

In 1977, the Legislature enacted MCL 600.2912a, setting forth the standards of care for general practitioners and specialists. At the time of trial, MCL 600.2912a provided:

> In an action alleging malpractice the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
>
> (a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
>
> (b) The defendant, if a specialist, failed to provide the recognized standard of care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard,

---

[16]Further, we note that the applicable legal duty in a negligence or malpractice action is a matter of law. *Moning v Alfono*, 400 Mich 425, 438; 254 NW2d 759 (1977). The Court of Appeals erred in holding that the standard of care was an evidentiary matter reviewed for an abuse of discretion. Once the correct standard of care is determined as a matter of law, an appellate court reviews for an abuse of discretion a trial court's rulings regarding the qualifications of proposed expert witnesses to testify regarding the specifics of the standard of care and whether the standard has been breached. *Bahr v Harper-Grace Hospitals*, 448 Mich 135, 141; 528 NW2d 170 (1995).

15

plaintiff suffered an injury.[17]

The trial court held that a "general" standard of care applied to Nurse Plamondon, ruling that because Nurse Plamondon was not a party, the "local standard" could not apply.  The court stated:

> [I] still don't consider that you look solely at the standard of care of the nurse, you look at the hospital's standard of care which I consider a general standard.

> * * *

> [T]he standard of care of the hospital is always going to be an issue when the hospital is not a solely owned hospital owned by one doctor or by one person, and so it's a general standard.

Defendant objected, arguing that nurses were not specialists and that a local standard of care applied.  On remand, the Court of Appeals affirmed the trial court's ruling, holding incorrectly that the issue was an evidentiary matter reviewed

---

[17]The statutory standards of care set forth in MCL 600.2912a are often referred to as the "general" or "local" standard of care for general practitioners and the "national" standard of care for specialists. See, e.g., *Bahr*, supra at 138. The term "national," however, is not an accurate description of the statutory standard of care for specialists. The plain language of subsection (b) states that the standard of care is that "within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances." MCL 600.2912a (emphasis added).  Under the plain language of the statute, then, the standard of care for both general practitioners and specialists refers to the community.

for an abuse of discretion.[18]

The question, then, is whether nurses are held to the standard of care of a general practitioner or a specialist under MCL 600.2912a. We conclude that neither statutory standard applies. MCL 600.2912a, by its plain language, does not apply to nurses. The statute does not define "general practitioner" or "specialist." When faced with questions of statutory interpretation, our obligation is to discern and give effect to the Legislature's intent as expressed in the statutory language. *DiBenedetto v West Shore Hosp*, 461 Mich 394, 402; 605 NW2d 300 (2000); *Massey v Mandell*, 462 Mich 375,

---

[18]We note that before reaching the issue, the Court of Appeals held that defendant had forfeited the issue by not objecting until trial, relying on *Greathouse v Rhodes*, 242 Mich App 221; 618 NW2d 106 (2000). This Court has since overruled *Greathouse*, 465 Mich 885; 636 NW2d 138 (2001), holding that "[t]here is no statutory or case law basis for ruling that a medical malpractice expert must be challenged within a 'reasonable time.'"

Further, the Court of Appeals on remand again chastised defendant for failing to bring a cross-appeal, stating:

> Accordingly, even if we were to conclude that defendant's issues on appeal provided grounds for relief, we would sua sponte apply the unclean hands maxim to allow the trial judgment to stand. [243 Mich App 93.]

As the dissenting Court of Appeals judge noted, we stated in our remand order, 462 Mich 859, that defendant has "properly and persistently raised" the issues in its appeal. 243 Mich App 94. There is no merit to the Court of Appeals contention that defendant has "unclean hands" for failing to file a cross-appeal.

17

379-380; 614 NW2d 70 (2000). Undefined statutory terms must be given their plain and ordinary meanings. *Donajkowski v Alpena Power Co*, 460 Mich 243, 248-249; 596 NW2d 574 (1999).  When confronted with undefined terms, it is proper to consult dictionary definitions.  *Id*.

*Random House Webster's College Dictionary* (1997) defines "general practitioner" as "a medical practitioner whose practice is not limited to any specific branch of medicine." "Specialist" is defined as "a medical practitioner who deals only with a particular class of diseases, conditions, patients, etc."  "Practitioner" is defined as "a person engaged in the practice of a profession or occupation." Therefore, for either subsection of MCL 600.2912a to apply, a person must be a "medical practitioner," or engaged in the practice of medicine.

Nurses do not engage in the practice of medicine.  MCL 600.5838a(1) provides that a medical malpractice claim may be brought against any "licensed health care professional."  MCL 600.5838a(1)(b) defined "licensed health care professional" as "an individual licensed or registered under article 15 of the public health code . . . ."  Turning to the Public Health Code, MCL 333.17201(1)(c) defines "registered professional nurse" as

> an individual licensed under this article to engage
> in the practice of nursing which scope of practice

includes the teaching, direction, and supervision of less skilled personnel in the performance of delegated nursing activities.

MCL 333.17201(1)(a) defines "practice of nursing" as

the systematic application of substantial specialized knowledge and skill, derived from the biological, physical, and behavioral sciences, to the care, treatment, counsel, and health teaching of individuals who are experiencing changes in the normal health processes or who require assistance in the maintenance of health and the prevention or management of illness, injury, or disability.

In contrast, MCL 333.17001(1)(c) defines "physician" as "an individual licensed under this article to engage in the practice of medicine." "Practice of medicine" is defined in MCL 333.17001(1)(d) as

the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts.

As the above definitions demonstrate, nurses do not engage in the practice of medicine. Therefore, by its plain terms, neither subsection of MCL 600.2912a applies to nurses. To determine the applicable standard of care for nurses, we must turn to the common law.

Malpractice actions against nurses were not recognized at common law. *Adkins v Annapolis Hosp*, 420 Mich 87, 94; 360 NW2d 150 (1984); *Kambas v St Joseph's Mercy Hosp*, 389 Mich 249, 253; 205 NW2d 431 (1973). The Legislature has, however,

19

made malpractice actions available against nurses by statute. MCL 600.5838a. Although the Legislature created a malpractice cause of action against nurses, it did not enact an applicable standard of care. Therefore, we review the rules of the common law applicable to actions for medical malpractice for the standard of care.[19]

A survey of our case law reveals that the standard of care at common law was the degree of skill and care ordinarily possessed and exercised by practitioners of the profession in similar localities. In 1896, this Court rejected a formulation of the standard of care that limited the scope to the individual's neighborhood, holding instead that the standard of care would be the ordinary skill in the individual's locality or similar localities. *Pelky v Palmer*, 109 Mich 561, 563; 67 NW 561 (1896). In 1915, this Court pronounced that "all the law demands is that [the defendant] bring and apply to the case in hand that degree of skill,

---

[19]The dissent characterizes our analysis as "outcome-determined." On the contrary, we have endeavored to faithfully apply statutory rules of construction and the common law. Interestingly, the dissent itself cites no authority whatsoever for its novel legal proposition that a national standard of care applies to a "unit" of defendant's hospital. No statutory or common-law basis for the dissent's assertion exists. The Legislature has prescribed the standard of care for general practitioners and specialists, not for "units." The common law does not address the application of a "national" standard of care for hospital "units." The dissent appears to have created its preferred legal scheme out of whole cloth.

20

care, knowledge, and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances (*Pelky*, [*supra*]; *Miller v Toles*, 183 Mich 252 [150 NW 118 (1914)]).” *Zoterell v Repp*, 187 Mich 319, 330; 153 NW 692 (1915).  In *Ballance v Dunnington*, 241 Mich 383, 386-387; 217 NW 329 (1928), we held that the standard of care of an x-ray operator was set “by the care, skill, and diligence ordinarily possessed and exercised by others in the same line of practice and work in similar localities.”  See also *Rubenstein v Purcell*, 276 Mich 433, 437; 267 NW 646 (1936).  In *Rytkonen v Lojacono*, 269 Mich 270, 274; 257 NW 703 (1934), we held:

> The rule is firmly established that defendant was bound to use the degree of diligence and skill which is ordinarily possessed by the average members of the profession in similar localities.

We conclude that this common-law standard of care applies to malpractice actions against nurses.  Therefore, the applicable standard of care is the skill and care ordinarily possessed and exercised by practitioners of the profession in the same or similar localities.  The trial court on remand shall instruct the jury regarding this standard.

IV
CONCLUSION

We conclude that to find a hospital liable on a vicarious liability theory, the jury must be instructed regarding the

21

specific agents against whom negligence is alleged and the standard of care applicable to each agent. An instruction merely naming a unit of the hospital, without more, relieves plaintiffs of their burden of proof and does not comport with substantial justice. Further, we hold that MCL 600.2912a, by its plain language, does not apply to nurses. Instead, nurses are held to the common-law standard of care, i.e., the skill and care ordinarily possessed and exercised by practitioners of the same profession in the same or similar communities. Accordingly, we reverse the judgment of the Court of Appeals and remand to the trial court for a new trial.

WEAVER, TAYLOR, and YOUNG, JJ., concurred with CORRIGAN, C.J.

22

TERESA COX, as a Next Friend of
BRANDON COX, a minor, TERESA COX
and CAREY COX, Individually,

    Plaintiffs-Appellees,

v                                         No.  118110

BOARD OF HOSPITAL MANAGERS FOR
THE CITY OF FLINT doing business as HURLEY
MEDICAL CENTER, a Municipal
Corporation,

    Defendant-Appellant.
_____

MARKMAN, J. (*concurring in part* and *dissenting in part*).

I respectfully concur in part and dissent in part.  I fully concur with the majority's legal determination that the trial court improperly modified SJI2d 30.01 by substituting "hospital neonatal intensive care unit" for the specific profession or specialties at issue.  However, I dissent from the majority's conclusion that this error requires reversal. Instead, I believe that the instruction, albeit flawed, adequately and fairly communicated the parties' theories of liability so that failure to reverse would not be inconsistent with substantial justice.

I also fully concur with the majority's legal determination that MCL 600.2912a does not apply to nurses.

Instead, as the majority correctly observes, nurses are held to the common-law standard of care, i.e., the skill and care ordinarily possessed and exercised by practitioners of the same profession in the same or similar localities. However, as with the instructional error issue, I do not believe that this error requires reversal. Instead, because, under the facts of this case, the common-law standard of care and the "national" standard of care were the same, failure to reverse would not be inconsistent with substantial justice.

Although, under different circumstances, these instructional errors might have been sufficient to warrant reversal, under the particular circumstances of this case, I do not believe that they can be so viewed.

## I. JURY INSTRUCTION

### A. STANDARD OF REVIEW

This case concerns the trial court's deviation from the standard instruction language set forth in SJI2d 30.01. This Court reviews claims involving instructional errors by a de novo standard. **Case v Consumers Power Co, 463 Mich 1, 6; 615 NW2d 17 (2000).**

> In doing so, we examine the jury instructions as a whole to determine whether there is error requiring reversal. The instructions should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them. Instructions must not be extracted piecemeal to establish **error. Even if somewhat imperfect, instructions do not create error requiring reversal if, on balance, the theories of the parties and the**

2

**applicable law are adequately and fairly presented to the jury. . . . We will only reverse for instructional error where failure to do so would be inconsistent with substantial justice. [*Id.* (citation omitted); see also MCR 2.613(A).]**

B. DISCUSSION

The standard jury instruction at issue reads as follows:

When I use the words "professional negligence" or "malpractice" with respect to the Defendant's conduct, I mean the failure to do something which a _____ (name profession) of ordinary learning, judgment or skill in [this community or a similar/ _____ (name particular specialty)] would do, or the doing of something which a _____ (name profession) of ordinary learning, judgment or skill would not do, under the same or similar circumstances you find to exist in this case. [SJI2d 30.01]

At trial, the court modified this standard instruction, and instead read the following instruction to the jury:

When I use the words professional negligence or malpractice with respect to the Defendant's conduct, I mean the failure to do something which a hospital neonatal intensive care unit would do or the doing of something which a hospital neonatal intensive care unit would not do under the same or similar circumstances you find to exist in this case.

It is for you to decide, based upon the evidence, what the hospital neonatal intensive care unit with the learning, judgment or skill of its people would do or would not do under the same or similar circumstances.

**Comparing the standard instruction with the modified instruction, it is clear that the trial court: (1) substituted, in the first paragraph, "a hospital neonatal intensive care unit" in place of a "name[d] profession"; (2) omitted, in the first paragraph, the phrase "ordinary**

3

learning, judgment or skill"; and (3) omitted, in the second paragraph, the word "ordinary" appearing before and modifying the clause "learning, judgment or skill."[1] Defendant maintains that these modifications amounted to a "gross deviation" from the standard instruction, thus depriving defendant of a fair trial.

Upon review of the first modification, i.e., the "unit" instruction, the majority finds that it was error requiring reversal for the trial court to insert "unit" in place of the specific profession or speciality at issue.[2] In support of its conclusion, the majority emphasizes that plaintiffs focused upon several members of the unit including a neonatologist, a respiratory therapist, a resident, and Nurse Plamondon-individuals who were subject to differing standards of care.[3] Because of these differing standards:

---

[1] The dissenting justice states that "[c]onsideration of the [third omission] is inappropriate because defendant forfeited it." Slip op, p 8, n 6. I respectfully disagree. Defendant, in its application for leave to appeal, asserted that the trial court's "gross deviation from SJI2d 30.01 . . . deprived defendant of a fair trial." This "gross deviation" included, among other things, the omission of the word "ordinary" from the standard jury instruction. In my view, analysis of this omission is a necessary part of an overall determination whether defendant here was truly deprived of a fair trial.

[2] Because the majority determined that the first modification amounted to error requiring reversal, it did not address the remaining two standard jury instruction modifications.

[3] Specifically, the majority states, correctly in my judgment, that "[t]he respiratory therapist, for example, may not be held to the standard of care of the neonatologist." Slip op at 13.

4

The "unit" instruction failed to ensure that the jury clearly understood 1) which agents were involved, and 2) that it could find professional negligence or malpractice only on the basis of the particular standard of care applicable to each employee's profession or specialty. [Slip op at 13.]

Thus, the majority finds that the jury was undermined in its task of determining whether any of defendant's agents individually fell below the appropriate standard of care and that, under these circumstances, substantial justice requires reversal. *Id.* at 14. I respectfully disagree. Although I am certainly not oblivious to the potential that the modified instruction had for confusing the jury, upon review of the whole record, I simply do not believe that this is what occurred here. I do not believe that such potential for confusion reflects the reality of what transpired at this trial. Rather, I believe that the jury clearly understood that the allegations of negligence were principally focused upon Nurse Plamondon, and that they understood Nurse Plamondon's specific standard of care.

In reviewing the particular instruction at issue, it must be emphasized that this instruction further clarified the "unit" reference by focusing on the "learning, judgment or skill of its people." When the trial court directed that the jury must examine the "learning, judgment or skill" of individual representatives of the defendant, the jury, based

upon the presentation of this case, almost certainly focused on the alleged negligence of a single person, Nurse Plamondon.

First, during opening arguments, plaintiff specifically and almost exclusively focused upon Nurse Plamondon's alleged negligence in: (1) allowing the umbilical arterial catheter (UAC) to become dislodged from infant Brandon Cox,[4] (2) failing to summon, in a timely manner, the assistance of an attending physician, and (3) medicating the infant without proper authorization from a physician.

> On the 10th at approximately four o'clock, a nurse, Nurse Plamondon, Martha Plamondon, attended to Brandon at four o'clock and she made a nursing note. She drew fluid out of this umbilical arterial catheter . . . and did other things to attend to the baby, and then she left.

> At 4:20 Brandon was found with the umbilical arterial catheter dislodged and he had lost . . . fifty-five to sixty percent of [his] blood. And Plamondon noticed this at 4:20. It happened some time between 4:00 and 4:20 that the catheter came out. And that is just simply not supposed to happen under ordinary circumstances . . . . That only happens when somebody was inattentive.

> * * *

> So Plamondon arrives and does she call a physician right away, does a physician respond right away? No. She arrives at 4:20. It's noted that this has happened to Brandon and nothing is done for him other than maybe some first aid to the umbilicus for fifteen minutes. . . .

---

[4] **As explained in the majority opinion, Brandon Cox was born on February 8, 1990 at 26 or 27 weeks gestation, weighing approximately 900 grams, and was admitted into defendant's neonatal intensive care unit (NICU).**

Finally, he's given Plasminate, which is a
fluid replacement.  It'll bring blood pressure up,
but it doesn't really contribute to oxygenation.

Consistently with opening arguments, plaintiffs' substantive evidence primarily focused on the alleged negligence of Nurse Plamondon.  Dr. Houchang Modanlou, an expert witness for plaintiff, testified that, upon review of Brandon's chart, he had discovered essentially three "criticisms" concerning the care that Brandon received at defendant's facility.  Dr. Modanlou criticized Nurse Plamondon's maintenance of the UAC, Nurse Plamondon's delay in responding to the dislodgment of the UAC, and Nurse Plamondon's decisions concerning appropriate emergency care.  Dr. Modanlou's testimony essentially excluded any other potential tortfeasors.  In particular, he stated that "from birth to the accident I did not have major criticism," and affirmed that there was "no [significant] criticism of any of the care rendered to Brandon Cox until the 4:00 to 4:20 p.m. time period on February the 10th."

Dr. Carolyn S. Crawford, another expert witness for plaintiffs, also focused her testimony almost exclusively on Nurse Plamondon.  In part, she affirmed that "it [was] incumbent upon the reasonably prudent nurse after repositioning a baby to ascertain for certain that that

catheter's in place and that the securing devices are still secure." With regard to the response pursuant to discovering the dislodged catheter, Dr. Crawford stated there was a breach in the standard of care "in not notifying the resident immediately, and in not calling for help . . . [i]t appeared that the nurse tried to handle the situation on her own for about fifteen minutes before she called for a doctor."

Plaintiff also labored to submit evidence discrediting Nurse Plamondon's version of the events surrounding the dislodged catheter. With regard to the administration of medication, Dr. Roberto Villegas, Jr., testified that, had he given Nurse Plamondon a medical order to administer Plasmanate, such an order would have been entered into Brandon's medical record either by himself or the nurse. Further, he testified that he would not have ordered a full 20cc of Plasmanate to be administered to Brandon, but instead would have ordered two separate 10cc dosages. Clearly, Dr. Villegas was called to testify solely for the purpose of proving that Nurse Plamondon had not received any medical orders for the administration of Plasmanate from Dr. Villegas, but instead administered it without proper authorization. Similarly, Richard Scott, a respiratory therapist, was called by plaintiffs to discredit Nurse Plamondon's assertion that she immediately called for a physician or resident upon

**8**

discovering the dislodged UAC, as well as to emphasize that Brandon was inactive and, therefore, would have been unable to dislodge the UAC connection as defendant speculated.

Indeed, defendant also made clear that the crux of this case focused upon Nurse Plamondon. At opening argument, defendant stated that "their expert is pointing to a nurse, Nurse Martha Plamondon, who happened to be on that shift when this was discovered." Defendant's subsequent proofs, not surprisingly as a result, sought principally to refute any negligence on the part of Nurse Plamondon.[5] Further, on appeal to this Court, defendant in its brief recognized that the alleged negligent conduct was focused upon Nurse Plamondon—"[a]t the outset it must be clearly understood that plaintiffs' experts' testimony was restricted to criticisms of the hospital's nurses, particularly Nurse Plamondon . . . ." On these bases, it seems reasonably clear, in my judgment, that virtually the entire thrust of this case focused on the negligence, or lack thereof, of one particular individual, Nurse Plamondon.

Obviously, this conclusion is at odds with the majority's, and Justice Kelly's, positions that this case essentially involved the negligence of several agents. While

---

[5] **Defendant also sought to negate the causation element as part of its case in chief.**

**9**

plaintiff, during closing argument, may have expressed concerns about individuals other than Nurse Plamondon, namely, Respiratory Therapist Richard Scott and Nurse Edith Krupp, reviewing the record in its entirety indicates to me that any potential negligent conduct on the part of these actors was an incidental inquiry here. Indeed, the primary purpose of even eliciting testimony from these individuals was essentially to support or negate the theories of negligence concerning Nurse Plamondon. For example, Scott's testimony focused on his observations concerning movements on the part of Brandon before the dislodgment of the UAC, as well as Nurse Plamondon's conduct after discovering the dislodged UAC. Plaintiffs primarily elicited this testimony in an effort to dispel defendant's theory that Brandon pulled the UAC out with his hands or feet as well as discredit Nurse Plamondon's testimony that she had immediately called out to Dr. Villegas upon discovering the dislodged UAC. Further, the substance of Ms. Krupp's testimony essentially focused on Brandon's medical condition before the dislodgment of the UAC. Thus, this testimony essentially was relevant to negating or supporting the causation element. Nurse Krupp also testified about an adjustment that she had made to the UAC the day before the incident involving Nurse Plamondon. However, because of its fleeting appearance in the record, I do not believe that it

**10**

materially altered the posture of this case, i.e., that the focus was on Nurse Plamondon.[6]

Because the record indicates that the gravamen of this dispute related to Nurse Plamondon, as opposed to other potential tortfeasors, I believe that the jury, when told to consider the "learning, judgment or skill" of defendant's representatives, principally focused on whether, one person, Nurse Plamondon, committed malpractice when she (1) "allowed" the UAC to come out of Brandon's umbilicus, (2) delayed in summoning the assistance of a physician, and (3) performed medical procedures without appropriate authorization. Thus, I believe that the instruction "adequately" and "fairly" communicated the theories of this case as presented by the parties to the jury, and that failure to reverse would not be inconsistent with substantial justice.

With regard to the second and third modifications of the standard instruction—the court's deletion of the phrase "of ordinary learning, judgement or skill" in the first paragraph and its deletion of the word "ordinary" before the qualifying phrase in the second paragraph, these modifications also, I believe, constituted instructional error.

SJI2d 30.01 provides that an alleged tortfeasor must fail

_____

[6] Nor, of course, would Nurse Krupp be subject to any different standard of care for purposes of jury consideration than Nurse Plamondon.

**11**

to do something that is normally required by such an individual "of ordinary learning, judgment or skill," or else must do something which an individual "of ordinary learning, judgment or skill" would not do under the same or similar circumstances. As Judge Griffin in dissent asserted, these phrases are contained within the standard jury instruction because this "ordinary" care standard constitutes a limitation upon a defendant's duty. For example, in the context of legal malpractice, this Court has stated:

> [A]ccording to SJI2d 30.01, all attorneys have a duty to behave as would an attorney "of ordinary learning, judgment, or skill . . . under the same or similar circumstances . . . ."
>
> [A]n attorney does not have a duty to insure or guarantee the most favorable outcome possible. An attorney is never bound to exercise extraordinary diligence, or act beyond the knowledge, skill, and ability ordinarily possessed by members of the legal profession. [*Simko v Blake*, 448 Mich 648, 656; 532 NW2d 842 (1995)]

As indicated in *Simko*, the limitation on one's standard of care is significant because it alerts the jury to the fact that a professional defendant need not conform his conduct to what is at a level *above* that of other members of his profession. Instead, he needs only to conduct himself in way that is consistent with others in his profession. For this reason, the trial court indeed erred when it deleted the phrase "of ordinary learning, judgement or skill" in the first paragraph of the instructions as well as when it deleted the

word "ordinary" before the qualifying phrase in the second paragraph. However, as with the first instructional error, I am of the opinion that these errors were harmless, under the particular circumstances of this case.

In reviewing the second modification, it is important to emphasize that a substantial portion of this clause did appear in the second paragraph. In part, the second paragraph of the instruction stated that the jury must decide what a neonatal unit, "with the learning, judgment or skill of its people would do under the same or similar circumstances." Although this qualifying phrase was not stated twice within the instruction, as it should have been, the essential concept that a comparison must be had with others who are comparably situated was reasonably communicated to the jury.

Further, a review of the record shows that both parties, in presenting their theories of the case, clearly communicated that Nurse Plamondon need not conduct herself in a way that exceeded the standards of other members of her profession. Instead, the parties exclusively focused on the conduct normally, or ordinarily, exhibited by other reasonably prudent nurses. Thus, the jury well understood that Nurse Plamondon's conduct need only be within the range of conduct exhibited by other members of her profession.

In sum, while the instruction in this case was clearly in

**13**

error, I am not convinced that the correct instruction, one devoid of these errors, would have resulted in any different verdict. Thus, in my view, failure to reverse would not be inconsistent with substantial justice.

## II. Standard of Care

Finally, while I agree with the majority's legal conclusion that nurses are held to the common-law standard of care, i.e., the skill and care ordinarily possessed and exercised by practitioners of the same profession in the same or similar localities, I believe that the trial court's decision to permit testimony asserting a "national" standard of care was harmless under the circumstances of this case. An error in a trial court's ruling is "not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice." MCR 2.613(A).

A review of the testimony shows that Nurse Plamondon had the duty to: (1) maintain and monitor the UAC, (2) summon a physician or resident in a timely fashion upon discovering the dislodgment of the UAC, and (3) provide medicinal treatment only under the direction of a physician or resident. These duties were apparently the same under either a "national" standard of care or a "common-law" standard of care. Further,

**14**

and equally importantly, the applicable standards of care in this case were simply not in dispute here. Instead, the parties only disputed whether Nurse Plamondon had breached the aforementioned duties and whether any resulting negligence was the cause of Brandon's injuries. Thus, because the duties of this nurse were apparently the same under either standard of care, and because the standards of care were not in dispute at trial, I believe that failure to grant a new trial or set aside the verdict would not be inconsistent with substantial justice.

CONCLUSION

In conclusion, I believe that the trial court erred in its instructions to the jury. Specifically, I agree with the majority that the trial court improperly substituted the "unit" for the specific profession or specialities at issue. In addition, I believe that the trial court improperly deleted "ordinary learning, judgment or skill" from the first paragraph of SJI2d 30.01, and improperly deleted "ordinary," from its second paragraph. In a different circumstance, it is quite easy to imagine that such errors would require reversal. Indeed, it is not *inconceivable* that such instructions might have confused the jury in this case. However, upon review of the whole record, I am convinced that the instructions "adequately" and "fairly" communicated the parties' theories

**15**

so that failure to reverse would not be inconsistent with substantial justice. The reality of this case is that the jury was presented with the alleged negligence of one person, Nurse Plamondon, and nothing in the jury instructions could reasonably have shifted this focus for the jury.

For these reasons, I would affirm the Court of Appeals decision.

# STATE OF MICHIGAN

## SUPREME COURT

TERESA COX, as next friend of
BRANDON COX, a minor, TERESA COX
and CAREY COX, individually,

    Plaintiffs-Appellees,

v                                    No. 118110

BOARD OF HOSPITAL MANAGERS FOR THE
CITY OF FLINT, doing business as
HURLEY MEDICAL CENTER, a municipal
corporation,

    Defendant-Appellant.
_____

KELLY, J. (*dissenting*).

    I disagree with the majority's conclusions (1) that a medical malpractice plaintiff must *always* allege the negligence of a specific individual in an action for vicarious liability and that jury instructions must reflect such allegations, and (2) that nurses are not subject to the standard of care for medical malpractice defendants as defined by the Legislature in MCL 600.2912a. I would hold that, in such cases, vicarious liability can be premised on proof that

an unidentified member or members of a discrete unit in a hospital were professionally negligent.

I would hold also that the trial court did not err when it applied a national standard of care to this case. Moreover, nurses practicing advanced care that requires special training are specialists within the meaning of MCL 600.2912a and therefore are subject to a national standard of care. Thus, I would affirm the Court of Appeals decision to uphold the jury verdict.

## I. Factual and Procedural History

Plaintiffs' son Brandon was born at defendant Hurley Medical Center extremely premature and underweight. Immediately after birth, Brandon was placed in level three neonatal intensive care. That neonatal intensive care unit (NICU) is reserved for the most seriously ill newborn patients. In the NICU, a doctor inserted an umbilical arterial catheter (UAC) into Brandon's abdomen to monitor his blood gas levels. The UAC was secured to Brandon with tape and sutures. Later, the UAC was adjusted by the NICU nurses and retaped.

Two days after Brandon's birth, Nurse Martha Plamondon drew blood from the UAC to test Brandon's blood gases and repositioned the baby. Twenty minutes later, at 4:20 p.m., a respiratory therapist discovered that Brandon was bleeding.

2

Brandon's UAC had become dislodged and he was suffering the effects of blood loss. He had lost approximately 40cc of blood, or about half of his total blood volume. By at least one account, Brandon had likely been bleeding the entire twenty minutes. However, no alarm had sounded.

The events that followed are in dispute. Nurse Plamondon testified that she applied pressure to stop the bleeding and administered a 20cc push of Plasmanate at the order of Dr. Robert Villegas. Dr. Villegas did not recall giving such an order. Although the hospital's procedures require that the physician who orders treatment be noted on a patient's chart, no doctor's name appears on Brandon's chart authorizing the 20cc push of Plasmanate. The 20cc push is recorded at 4:40 p.m., twenty minutes after Brandon was discovered bleeding. Dr. Villegas testified that he would have ordered two separate pushes of 10cc of Plasmanate had he done anything at all.

A resident doctor, Dr. Amy Sheeder, arrived in answer to a page from Nurse Plamondon. Dr. Sheeder ordered another push of 10cc of Plasmanate, as well as 20cc of packed blood cells. Brandon was also given additional oxygen through an increase in his respirator rate and "bagging." The following day, he was transferred to Children's Hospital, where an ultrasound revealed that he had suffered intercranial bleeding, and he was diagnosed as having cerebral palsy. Brandon has ongoing

3

mental and physical disabilities.

Plaintiffs filed a medical malpractice claim against defendant and one of its doctors, Dr. Edilberto Moreno. Dr. Moreno was dismissed by stipulation before trial, leaving no member of defendant's hospital staff named as a defendant. Plaintiffs alleged that the defendant medical center was vicariously liable for the active and passive negligence of the NICU staff (1) in allowing the UAC to become dislodged, and (2) in failing to respond properly once the UAC became dislodged. They claimed that the resulting blood loss and treatment caused Brandon's mental and physical disabilities.

Plaintiffs were awarded $475,000 in mediation. They accepted the award, but defendant rejected it. At trial, defendant challenged plaintiffs' expert witnesses, Dr. Houchang Modanlou and Dr. Carolyn Crawford. Each testified about the standard of care in an NICU and each concluded that defendant's NICU staff breached the standard of care. Defendant argued that the doctors were unfamiliar with the standard of care in the locality. The trial judge rejected defendant's argument that a local standard of care applied to the case.

Both of plaintiffs' expert doctors were permitted to testify that members of defendant's NICU breached the standard of care in their treatment of Brandon. Their testimony

4

established, also, that NICU staff negligence caused Brandon's injuries. As the trial progressed, at times plaintiffs focused on the negligence of Nurse Plamondon at times and at other times advanced a broader theory of liability against the entire NICU.

By closing argument, plaintiffs settled on the broader theory that substandard basic care in the NICU caused Brandon's injuries. Although plaintiffs named Nurse Plamondon in the closing argument, they left it to the jury to determine whether anyone in the NICU committed malpractice. At the very least, these were alternate theories of defendant's liability. Defendant offered expert testimony supporting a contrary view, arguing that Brandon, born at just twenty-six or twenty-seven weeks' gestation and 900 grams, was likely to have mental and physical disabilities without an intervening cause.

Defendant requested jury instructions confining the negligence issue to an evaluation of a neonatal nurse practitioner in the same or similar circumstances. Defendant argued that plaintiffs' case was confined to allegations about Nurse Plamondon. The trial court rejected the argument, concluding that plaintiffs' case was not limited to Nurse Plamondon. On its own initiative and over defendant's objection, the trial judge modified the standard jury instructions. SJI2d 30.01. He instructed the jury that it

should consider whether the NICU failed to do what an NICU would do under the same or similar circumstances.  The jury found in plaintiffs' favor and awarded $2,400,000.

Defendant moved for judgment notwithstanding the verdict, a new trial, or remittitur.  The trial judge granted remittitur, ordering a new trial unless plaintiffs accepted the $475,000 awarded at mediation.  Plaintiffs appealed to the Court of Appeals, which remanded the case to the trial court for a detailed opinion supporting the remittitur amount.[1]  On remand, a different judge reversed the remittitur and granted JNOV for defendant.  Plaintiffs appealed again, and the Court of Appeals reversed and reinstated the jury verdict, which the panel found was supported by sufficient evidence.[2]  The panel refused to reach issues raised by defendant because it had not properly filed its cross appeal.

Rather than appeal from that decision, defendant returned to the trial court where, over plaintiffs' objection, the judge entered a new order on the jury verdict.  When defendant sought review of that order, the Court of Appeals affirmed the original judgment on procedural grounds.  It held in a split decision that the trial court lacked the authority to issue a

---

[1]Unpublished order, entered December 14, 1994 (Docket No. 179366).

[2]Unpublished opinion per curiam, issued November 22, 1996 (Docket No. 184859).

6

new order and that the law of the case barred defendant's appeal.[3]

Defendant sought leave to appeal here and, in a split decision, this Court vacated the most recent Court of Appeals decision and remanded for consideration of defendant's arguments.[4] On remand, the Court of Appeals resolved the issues against defendant and again upheld the jury verdict in a split decision.[5] Defendant again filed an application for leave to appeal to this Court. After initially denying leave, a majority of this Court granted defendant's motion for reconsideration and granted leave to appeal. 465 Mich 943 (2002).

## II. Jury Instruction

We review claims of instructional error de novo. *Case v Consumer Powers Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). However, to the extent that the review requires an inquiry into the facts, we review the trial court's decision on underlying factual issues for an abuse of discretion. See *Hilgendorf v St John Hosp & Medical Center*, 245 Mich App 670, 694-695; 630 NW2d 356 (2001); *Isagholian v Transamerica Ins*

---

[3]Unpublished opinion per curiam, issued April 6, 1999 (Docket No. 205025).

[4]462 Mich 859 (2000).

[5]243 Mich App 72; 620 NW2d 859 (2000).

7

*Corp*, 208 Mich App 9, 16; 527 NW2d 13 (1994).

The trial court did not abuse its discretion in this case when it rejected defendant's argument that plaintiffs' case was confined to allegations of Nurse Plamondon's negligence. It was correct to modify the standard jury instructions to reflect plaintiffs' theory of the case, rather than deliver defendant's requested instructions focusing on Nurse Plamondon.[6]

A trial court is permitted, in fact required, to modify the standard jury instructions to fit the facts of a particular case. See *Case*, *supra* at 6; see also *Tobin v Providence Hospital*, 244 Mich App 626, 672-673; 624 NW2d 548 (2001). This case is unusual in that every member of the NICU is a specialist, subject to a national standard of care. See part III. Moreover, plaintiffs did not allege a highly technical failure that could be a breach of the standard of care for one member of the NICU and not another.

The evidence here was that, in an NICU, a UAC should not

---

[6]In his dissenting and concurring opinion, Justice Markman discusses the trial court's omission of the word "ordinary" from the jury instructions. Slip op, pp 12-14. Consideration of the issue is inappropriate because defendant forfeited it. Defendant did not raise it until, six years after the jury verdict, the dissenting judge on the Court of Appeals panel identified the omission as grounds for reversal. See 243 Mich App 96-98. The issue had not been brought before that Court, was not raised in the trial court, and is only now argued by defendant for the first time.

become dislodged.  A baby should not bleed for twenty minutes.  And a baby of Brandon's size should not be given a single push of 20cc of Plasmanate, let alone a total volume of 50cc Plasmanate and blood within one hour and twenty minutes.  Moreover, there was evidence that Brandon's respirator was set too high, causing his lungs to rupture and contributing to a diminished oxygen supply.  Regardless of whether it was a nurse or doctor responsible for these errors, there was evidence of a breach of the general standard of care appropriate for a level three NICU.

In many if not the majority of medical malpractice cases, the instructions modeled after SJI2d 30.01 must specify the individual medical professionals alleged negligent and articulate a standard of care for each professional.  However, the negligence alleged in this case mingles the culpability of several members of defendant's NICU staff.  Plaintiffs were not able to determine which member of the staff was responsible for certain actions because the hospital records were incomplete and the NICU staff members implicated one another.

Considering all the circumstances, it was permissible to instruct the jury regarding the negligence of the discrete hospital unit.  The trial court did not err when it instructed the jury:

When I use the words professional negligence or malpractice with respect to the Defendant's conduct, I mean the failure to do something which a hospital neonatal intensive care unit would do or the doing of something which a hospital neonatal intensive care unit would not do under the same or similar circumstances you find to exist in this case.

It is for you to decide, based upon the evidence, what the hospital neonatal intensive care unit with the learning, judgment or skill of its people would do or would not do under the same or similar circumstances. . . .[7]

To establish medical malpractice, a plaintiff must prove: "(1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995). To establish vicarious liability against a hospital, a plaintiff must show

---

[7]I recognize that the instructions are a significant departure from the standard jury instructions, SJI2d 30.01, which, when unmodified, provide:

When I use the words "professional negligence" or "malpractice" with respect to the Defendant's conduct, I mean the failure to do something which a [name profession] of ordinary learning, judgment or skill in [this community or a similar community/ name particular specialty] would do, or the doing of something which a [name profession] of ordinary learning, judgment or skill would not do, under the same or similar circumstances you find to exist in this case.

It is for you to decide, based upon the evidence, what the ordinary [name profession] of ordinary learning, judgment or skill would do or not do under the same or similar circumstances.

10

that an agent of the hospital committed malpractice. The principal is held to have done what the agent did. *Smith v Webster*, 23 Mich 298, 299-300 (1871); see also *Ducre v Sparrow-Kroll Lumber Co*, 168 Mich 49, 52; 133 NW 938 (1911).

As is true in any malpractice claim, the individual or individuals alleged to be negligent must have breached the standard of care within the course of the physician-patient relationship. See *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 45; 594 NW2d 455 (1999); *Bronson v Sisters of Mercy Health Corp*, 175 Mich App 647, 652; 438 NW2d 276 (1989).

The majority adopts defendant's position that a plaintiff has not proven a case of medical malpractice vicarious liability until the plaintiff has (1) identified the specific individual professional or professionals who breached the standard of care and (2) proven that the individual breached the applicable standard of care. It asserts that the unit instructions in this case improperly limited the burden of proof for plaintiffs.

However, neither defendant nor the majority identifies any authority for the proposition that a medical malpractice plaintiff must always allege the negligence of a specifically named individual. This is because there is no such authority. Whether unit liability instructions, such as were given in this case, are ever permissible is an issue of first

11

impression.[8]

Where a plaintiff alleges the discrete negligent act of a hospital's agent, the jury must be instructed on that individual's obligation to meet a specific standard of care. Here, plaintiffs alleged that the NICU staff failed to properly maintain a UAC as a level three NICU should.

Where no unit member can be shown negligent, but negligence is established, plaintiffs need not prove which one breached the generally applicable standard of care to find the principal vicariously liable. In this unusual case, plaintiffs shouldered and satisfied the burden of proving malpractice supporting their vicarious liability claim using the unit theory.

A medical malpractice plaintiff must prove (1) duty, though a physician-patient relationship, (2) breach of duty, through a breach of the standard of care, (3) proximate causation, and (4) harm. A plaintiff does not escape this burden when, as in this case, the jury is instructed concerning the liability of a discrete hospital unit.

---

[8]The majority criticizes my position as unsupported by authority. Slip op at 11, n 12. However, it also offers no authority for the notion that an individual agent of a hospital must be named and proven negligent in every case of vicarious liability. *Tobin, supra*, stands for the proposition that jury instructions must be modified to fit the facts of the case. It does not hold that they must always identify specific individuals and different standards of care.

12

Here, evidence was presented that supported the jury's conclusion that (1) every member of the NICU had a physician-patient relationship with Brandon, and therefore a duty to meet the standard of care, (2) the care Brandon received in the NICU was sub-standard, under the established standard for basic care given in an NICU, (3) the breach of care caused prolonged oxygen deprivation and an intercranial bleed, and (4) the oxygen deprivation and bleed permanently harmed Brandon. Under the circumstances of this case, the unit theory of liability did not relieve plaintiff of any burden whatsoever.

The rule of law adopted by the majority actually increases a plaintiff's burden in vicarious liability medical malpractice cases. In this case, evidence supports the jury's conclusion that the patient's care was mishandled by a discrete hospital unit. It shows that an agent of the hospital committed malpractice, either alone or as part of a system's mismanagement. In such a case, it should not be necessary for the plaintiff to prove which individual is culpable. A rule requiring such a showing allows hospitals to benefit from their employees' fingerpointing and poor record keeping.

The dissenting Court of Appeals judge believed that, because a hospital must render treatment through its

physicians and nurses, a plaintiff must specifically identify the individuals who are negligent, citing *Danner v Holy Cross Hosp*, 189 Mich App 397, 398-399; 474 NW2d 124 (1991). I do not dispute that it is the doctors and nurses in the NICU that are alleged to be negligent in this case. However, to conclude that, because there is no specifically named individual, there is no physician-patient relationship to support plaintiffs' claim against defendant is fatuous.

In this case, every member of defendant's NICU had a provider-patient relationship with Brandon. Thus, no matter which individual was named, that requirement would be satisfied. It would have been satisfied if plaintiffs and the trial court had listed each member of the NICU and it was satisfied by referring to those individuals collectively as "the hospital neonatal intensive care unit."[9]

---

[9]The majority tries to paint the NICU as only a physical thing, "a geographic location within the hospital," rather than a discrete collection of defendant's employees or agents. Slip op at 10. While I would agree that a physical unit itself cannot form the basis of defendant's vicarious liability, the term was an apt description of a group of individuals. It is the group that breached the standard of care in this case. It distorts reason to conjecture that the jury understood "the hospital neonatal intensive care unit" to be a physical thing and not a descriptive term encompassing those employees of defendant responsible for Brandon's care.

Moreover, defendant argued that Nurse Plamondon was the sole member of its staff that plaintiffs claimed to be negligent. The trial court was justified in rejecting that argument on the basis of evidence. I agree with the Court of

(continued...)

14

My view is consistent with the Court of Appeals holding in *Tobin, supra*. There, the panel held that SJI2d 30.01 must be modified to fit the facts of the case at hand. It concluded that the trial court erred when it delivered the following generalized instructions:

> When I use the words "professional negligence" or "malpractice" with respect to the defendant's conduct, I mean the failure to do something which a hospital's agents/servants/employees of ordinary learning, judgment or skill in this community or a similar one would do, or the doing of something which a hospital's agents/servants/employees of ordinary learning, judgment or skill would not do, under the same or similar circumstances you find to exist in this case.
>
> It is for you to decide, based upon the evidence, what the ordinary hospital's agents/servants/employees or [sic, of] ordinary learning, judgment or skill would do or would not do under the same or similar circumstances. [*Id.* at 672.]

*Tobin* correctly determined that the standard instructions were too nonspecific to allow the jury to determine whether any of the defendant's employees breached the standard of care. *Id.* at 673. As in this case, the alleged malpractice in *Tobin* was limited to the vicarious liability of a hospital defendant. However, in sharp contrast to the case at hand, the allegations of medical negligence in *Tobin* were complex.

[9](...continued)
Appeals that defendant should have requested more specific instructions naming the people within the NICU if it objected to identifying the wrongdoer as the unit. It did not do so.

15

Also, each of the individuals alleged to be negligent was subject to a different standard of care. The plaintiff in *Tobin* essentially alleged that a nurse anaesthetist, medical technician, emergency room surgeon, and critical care physician, or a combination of them, breached the applicable standards of care. See *id.* at 660. She claimed that those breaches caused her husband to receive an unauthorized blood transfusion and that the blood was contaminated with bacteria, causing her husband's death. *Id.* at 631.

Whereas the instructions modeled after SJI2d 30.01 needed to be specific in *Tobin*, they were more appropriately general in this case. A trial court must consider the facts of every case and deliver instructions that best convey the applicable legal theories to the jury. Accordingly, I would endorse the Court of Appeals clear directive to trial courts in *Tobin*: "[I]nstruct the jury using a modification of SJI2d 30.01 that accurately delineates the standards of care applicable to the various medical personnel who plaintiff contends committed malpractice . . . ." *Id.* at 675.

This is not a case of res ipsa loquitur, even as that doctrine has been loosely construed in Michigan.[10] In a

---

[10]Michigan courts do not apply true res ipsa loquitur in medical malpractice cases. Strictly applied, res ipsa loquitur relieves a plaintiff of proving the exact negligent act that caused an injury, looking only to the result when the

(continued...)

medical malpractice case, a plaintiff may present expert testimony that, but for a breach of the standard of care, the result in the case would not have occurred. This is sufficient evidence of the breach to go to a jury. See *Jones v Poretta*, 428 Mich 132, 154-155; 405 NW2d 863 (1987). Res ipsa loquitur refers to circumstantial evidence of negligence where the specific incidence of negligence cannot be identified. *Id.* at 150, citing *Mitcham v Detroit*, 355 Mich 182, 186; 94 NW2d 388 (1959). Here, the incidents of negligence were identified, but the specific actor was not.

This is a stronger case for liability than the ordinary claim of res ipsa loquitur. It is not necessary to speculate that someone must have been negligent on the basis that there is direct evidence of negligence. This case does not rely on expert testimony that, but for someone's negligence, Brandon would not be impaired, a conclusion unsupported by the evidence. Here, there was expert testimony that a UAC would not become and remain dislodged for twenty minutes in a level

---

[10](...continued)
plaintiff's condition must have happened through some negligence. *Jones v Poretta*, 428 Mich 132, 150; 405 NW2d 863 (1987); See Prosser, Torts (4th ed), § 39, p 222-224. In contrast, the Michigan rule requires that the plaintiff prove the breach of the standard of care, or "more than a bad result." This is accomplished in a medical malpractice case with expert testimony that the result would not have happened had the plaintiff been treated in accordance with the standard of care. *Jones*, *supra* 151-156.

three NICU if the staff had complied with the standard of care. That was direct evidence that the staff breached that standard.

Moreover, this is not a case of the discrete negligence of an individual caregiver. Rather, what the evidence established was a systemic failure of the NICU. Several errors were made related to the maintenance of the UAC. First, there was evidence that the UAC should not have become dislodged. This could have happened because it was improperly inserted by one of the physicians or it could have happened because Nurse Plamondon dislodged it when she checked Brandon.

Second, once the UAC became dislodged, there was evidence that someone in the NICU should have noticed sooner that Brandon was in distress. Both Nurse Plamondon and Dr. Villegas were present. Third, there was evidence that either Nurse Plamondon or both she and Dr. Sheeder gave Brandon too great a volume of Plasmanate and red blood cells within too short a time.

Finally, there was evidence that Brandon's respirator was set too high in response to his blood loss, causing ruptured alveoli in his lungs and contributing to his depleted oxygen level. This, like the administering of Plasmanate, was a medical decision that should not have been made by Nurse Plamondon.

18

The evidence does not reveal with certainty which member of the NICU staff was responsible for each of these failures. It does establish that the members of the NICU as a group breached the standard of care for a NICU. Had the jury been instructed on the negligence of Nurse Plamondon, Dr. Villegas, or Dr. Sheeder, individually, it might not have been able to identify which was negligent. Evidence of who was responsible for the negligent acts was much more readily accessible to defendant than to plaintiffs. For that reason and because this is a case of vicarious liability, plaintiffs did not need to specify which members of the NICU staff breached the general standard of care.

The unit negligence instruction does not relieve plaintiffs of their burden of proof under the circumstances of this case. On the contrary, the majority's blanket rule oversimplifies the case and increases the burden on plaintiffs. Although the majority's holding would be sound if the responsible individual or individuals could be identified, in this case it was not possible. The hospital staff failed to record who took what action. The effect of the holding, rather than reduce plaintiff's burden, is to insulate the malpractice defendants from vicarious liability.

There was evidence here of substandard care given by a hospital unit. The trial court's modified instructions

properly conveyed a legitimate legal theory to the jury without risk of added confusion. It was correct.

### III. Standard of Care

Defendant argues that because (1) the only negligence alleged in this case was that of Nurse Plamondon, and (2) all nurses are subject to a local standard of care, the trial court erred when it concluded that a national standard of care applied in this case. As the majority notes, the Court of Appeals did not address this issue. Instead, it focused on whether the trial court abused its discretion when it admitted Dr. Modanlou's expert testimony concerning the national standard of care. This is understandable, as defendant has consistently fused two distinct issues. Even in its brief before this Court, defendant asserts the standard of review for an evidentiary error. It does not identify what standard of care applies to the alleged malpractice, a legal question. Hence, the majority reaches an issue that was never clearly argued or properly raised.

Whether all nurses are subject to a local standard of care is a legal question that requires statutory interpretation, which this Court reviews de novo. See *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991). It is an issue of first impression.

Defendant relies on cases that do not reach whether nurses can ever be considered specialists. I would reject its argument for two additional reasons: First, the trial court correctly determined that plaintiffs alleged the negligence of more people than just Nurse Plamondon. Because I believe it was permissible to allege the negligence of the NICU, the standard of care here should be that applicable to the NICU as a whole, a national standard of care. See part II.

This is not to be confused with the standard of care for an NICU physician, a neonatologist, or an NICU nurse. In a medical malpractice case where a plaintiff alleges a more technical breach, the more specific standard of care for the individual alleged to have been negligent must be applied. In this case, only the standard of basic care was at issue.

Second, even if Nurse Plamondon were the only individual alleged to be negligent, a nurse who is specially trained to give advanced care is a specialist under MCL 600.2912a, subject to a national standard of care. Therefore, I disagree with the "guidance" the majority offers to the trial court. Here, every member of the NICU staff, both doctors and nurses, had been specially trained to care for critically ill newborn infants. Therefore, every individual and the unit as a whole were subject to the national standard of care for maintaining a UAC in a level three NICU.

It has been established that healthcare providers are subject either to a national or a local standard of care. In 1975, faced with the argument that the locality rule should be abandoned for a more national standard,[11] the Legislature codified the two different standards of care for medical malpractice defendants. MCL 600.2912a. The local standard was designated for the "general practitioner" and the national for the "specialist." It falls to this Court to determine which medical caregivers fit into the category of "general practitioner" and which are "specialists." On the basis of the Legislature's directive in MCL 600.2912a, I would conclude that a nurse may be either, depending on the level of training and expertise the job requires.

MCL 600.2912a(1) provides, in relevant part:

[I]n an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

---

[11]In his concurring opinion in *Siirila v Barrios*, 398 Mich 576, 625-630; 248 NW2d 171 (1976), Justice Williams argued for abandonment of the locality rule in favor of a national standard of care for all medical caregivers. He urged local practice as but one consideration in evaluating the standard of care.

(b) The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

Therefore, general practitioners usually are subject to a local standard of care and specialists are held to a national standard. The language of MCL 600.2912a quite clearly does not distinguish between physicians and nurses when it classifies "the defendant" in a medical malpractice case as a specialist or general practitioner. There is no reason to depart from the statute and treat physicians and nurses differently, where the relevant issue is the level of the defendant's training and knowledge.

The majority, in an analysis that has the appearance of being outcome determined, departs from the Legislature's directive when it concludes that MCL 600.2912a does not apply to nurses. It claims to rely on the plain language of MCL 600.2912a in concluding that the specialist-general practitioner dichotomy does not apply to nurses.[12] However, after disregarding the obvious scope of MCL 600.2912a, the majority bases its conclusion solely on the definitions of "general practitioner," "specialist," "practitioner," "medical

---

[12]Slip op at 17.

23

practitioner," "licensed health care professional," "registered professional nurse," "physician," and "practice of medicine." In so doing, it looks far afield of the statute, which plainly and unambiguously applies to every defendant in a medical malpractice action.

Next, given that all medical malpractice defendants are subject to MCL 600.2912a, one must determine whether a nurse may ever be considered a specialist for the purposes of the statute. A specialist is "a person devoted to one subject or to one particular branch of a subject or pursuit," or "a medical practitioner who deals only with a particular class of diseases, conditions, patients, etc." *Random House Webster's College Dictionary* (1997).

It is well established that one engaging in the prenatal care of an infant is generally considered a specialist, subject to a national standard of care. See, e.g., *Thomas v McPherson Community Health Center*, 155 Mich App 700, 708; 400 NW2d 629 (1986); *Swanek v Hutzel Hosp*, 115 Mich App 254, 257; 320 NW2d 234 (1982); *McCullough v Hutzel Hosp*, 88 Mich App 235, 241; 276 NW2d 569 (1979). However, a specialist is classified as such by virtue of advanced training, not merely by having concentrated in a specific area of practice. See *Jalaba v Borovoy*, 206 Mich App 17, 21-22; 520 NW2d 349 (1994); *Dunn v Nundkumar*, 186 Mich App 51, 53; 463 NW2d 435 (1990).

Applying the facts of this case to that law, a nurse can specialize in an area of care that requires advanced training particular to a type of practice. For example, Nurse Plamondon specialized in neonatal intensive care. She received intensive training before she could work in the NICU. There was evidence that she was able to perform procedures necessary for the needs of an infant in the level three NICU, for which even the resident doctor was untrained. All staff members specially trained to care for patients in a specialized hospital unit, including nurses, must be subject to a national standard of care for their individual roles. Thus, if the only issue were Nurse Plamondon's negligence, the national standard of care would apply to this case.

Even if the majority were correct that MCL 600.2912a applies only to physicians, a local standard of care should not apply. Plaintiffs alleged that the NICU as a unit failed to give Brandon the care he should have received there. The evidence supported plaintiffs' theory that Brandon's UAC should not have been dislodged long enough to spill half his blood volume, and the NICU should not have responded as it did. Where the care given in a unit is specialized, all of it should be measured against the national standard for the basic care offered to patients in such a unit.

It is apparent to me that defendant is employing smoke

and mirrors when asking for a new trial because a national rather than a local standard of care was applied. Defendant never articulated, either before the trial court or here, how the two standards are different. Upon examination, it is apparent that the local and national standards for a practitioner in an NICU are one and the same. If, on remand, the trial court were to conclude that plaintiffs advanced a claim against only Nurse Plamondon, her care of Brandon would be measured by the same standard applied earlier. Merely the name, "local standard of care," would be changed.

## IV. Conclusion

I would affirm the Court of Appeals decision to uphold the jury verdict against defendant. On the particular facts of this case, I cannot conclude that it was error to instruct the jury regarding the negligence of the hospital unit. The instructions properly conveyed a valid legal theory of vicarious liability to the jury without additional risk of confusion. Moreover, the trial court was correct to apply a national standard of care to this case. Plaintiffs advanced a claim against more than just Nurse Plamondon.

Also, I would hold that nurses who (1) have received specialized training to give advanced care and (2) practice exclusively within an area of medicine recognized as a specialty are specialists within the meaning of MCL 600.2912a.

26

Thus, even if plaintiffs' medical malpractice claim were premised only on Nurse Plamondon's actions, the care she gave Brandon should be weighed on a national standard.

CAVANAGH, J., concurred with KELLY, J.