BAHR v HARPER-GRACE HOSPITALS

Docket Nos. 96660, 96661. Argued *October* 4, 1994 (Calendar No. 3).
Decided March 7, 1995.

Elizabeth J. Bahr, as personal representative of the estate of her
son, Brian, deceased, brought a medical malpractice action in
the Wayne Circuit Court, against Harper-Grace Hospitals and
Theodore Wizenberg, M.D., for damages suffered by her son
while in their care that eventually resulted in his death. After
entering a consent judgment for the plaintiff with respect to
Dr. Wizenberg, the court, Claudia House Morcom, J., entered
judgment on a jury verdict for the plaintiff against the hospital.
The Court of Appeals, JANSEN, P.J., and CORRIGAN, J.
(MICHAEL J. KELLY, J., dissenting), reversed and remanded for
a new trial, limited to the issue of the hospital's responsibility
for the negligence of its nurses (Docket Nos. 119957, 121364).
The plaintiff appeals.

In an opinion by Justice LEVIN, joined by Chief Justice
BRICKLEY, and Justices CAVANAGH, BOYLE, RILEY, and MALLETT,
the Supreme Court *held:*

1. The trial court did not abuse its discretion in finding that
the plaintiff's expert witness was qualified to testify regarding
the standard of care applicable to residents and interns in
Detroit and similar communities. The Court of Appeals erred in
reversing the judgment for the plaintiff on the basis that the
expert was *not so* qualified.

2. The Court of Appeals did not err in remanding for a new
trial regarding the applicable standard of care for nurses on
the ground that reasonable persons could have reached differ-
ent conclusions about the negligent conduct of the nurses.

Affirmed in part, reversed in part, and remanded for further
proceedings.

Justice WEAVER took no part in the decision of this case.

198 Mich App 31; 497 NW2d 526 (1993) affirmed in part and
reversed in part.

*Mark ·Granzotto* and *Arnold M. Podolsky* for the
plaintiff.

*Garan, Lucow, Miller, Seward, Cooper & Becker,
P.C.* (by *Daniel S. Saylor* and *Carol Holmes*), for
the defendant.

LEVIN, J. Elizabeth Bahr, as personal represen-
tative of the estate of her son, Brian, obtained a
substantial general verdict against Harper-Grace
Hospitals for the medical malpractice of its in-
terns, residents, and nurses.

The Court of Appeals reversed[1] because Bahr
failed to show that plaintiff's expert witness, Eric
Neilson, M.D., was familiar with the standard of
care for interns and residents in Detroit or "simi-
lar communities." It remanded for a new trial
limited to the issue of Harper-Grace's responsibil-
ity for negligence of nurses because it found that
Bahr had presented expert testimony from Edwina
Eggleston, R.N., regarding the applicable standard
of care for nurses and "reasonable persons could
have reached different conclusions with regard to
the negligent conduct of the nurses."[2]

We agree with the Court of Appeals conclusion
respecting the claimed negligence of the nurses,
but disagree with its conclusion that Bahr failed to
provide an adequate foundation for expert testi-
mony respecting the claimed negligence of the
intern and resident. We remand to the Court of
Appeals to consider the issues raised by Harper-
Grace that were not reached by the Court of
Appeals, including the claim, not specifically ad-
dressed by the Court of Appeals, that the jury
should not have been permitted to find that nurse
negligence was a cause of Bahr's death.

I

Brian Bahr was admitted to Harper Hospital

[1] 198 Mich App 31, 35; 497 NW2d 526 (1993).
[2] *Id.* at 33-34.

after apparently developing pneumonia. A laboratory test indicated a low blood-sodium level. Bodily fluids are normally one percent saline. A three percent intravenous saline solution was ordered.

The three percent saline solution was administered intravenously beginning at 4:00 A.M. The last hourly check was sometime before 7:00 A.M. by a nurse who went off duty at 7:00 A.M. The nurse who came on duty at 7:00 A.M. occupied herself with examining patient records and other paperwork, and did not check on Bahr. At 7:47 A.M., his personal physician arrived and found him in cardiac arrest. Bahr was resuscitated, but, because his heart had stopped for between four and ten minutes, he sustained brain damage. He remained in a coma and died twenty-five days later.

Bahr had been under the care of his personal physician, Theodore Wizenberg, M.D., a resident, Pankaj Hukku, M.D., and an intern, Mark Huntoon, M.D. All three were involved in the medical decisions regarding Brian's care.

On the fifth day of trial, Bahr and Wizenberg settled, and the trial continued against Harper-Grace respecting Bahr's claim that Brian's death was caused by malpractice of the resident, intern, and nurses.

The dissenting judge in the Court of Appeals observed that there were "three critical points from which the trier of fact could have determined, and in this case did determine, malpractice," and that the factual issues were:

> 1. Whether an arterial blood gas test should have been performed to determine if it was safe to give decedent fluids.
> 2. Whether the 0.9 percent saline solution should have been increased to three percent in. view of the patient's rising sodium content.

3. Whether, having ordered the three percent saline solution administered, the defendant's physicians should have known that danger of cardiac arrest was thereby increased and that the decedent's condition should have been monitored continuously, or at least more carefully.[3]

II

The Court of Appeals said, and we agree, that the standard of care for general practitioners is that of the local community or similar communities,[4] and is nationwide for a specialist.[5] The parties agreed, and the Court of Appeals said, that interns and residents, as nonspecialists, are held to the standard of care of the local community or similar communities.[6]

A majority of the Court of Appeals panel acknowledged that Dr. Neilson had testified that he was familiar with the standard of care for interns,

[3] *Id.* at 39.

[4] *Fortner v Koch,* 272 Mich 273, 281; 261 NW 762 (1935).

Subject to subsection (2), in an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

(b) The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury. [MCL 600.2912a(1); MSA 27A.2912(1)(1).]

[5] *Naccarato v Grob,* 384 Mich 248, 253; 180 NW2d 788 (1970). See n 4.

[6] 198 Mich App 34.

residents, and nurses, but said that there was no testimony that he was familiar with the standard of care for interns, residents, and nurses in Detroit or similar communities.[7] We reverse, and conclude that the trial judge did not abuse her discretion in finding that Neilson was qualified to testify regarding the standard of care applicable to interns and residents in this case.[8]

A

Dr. Neilson, an internal medicine specialist and associate professor of medicine at the University of Pennsylvania, testified that an arterial blood gas test should have been ordered by the resident and intern to determine the pneumonia's effect on Bahr's blood-oxygen level, and that it was a violation of the standard of care for the resident or intern to fail to administer such a test before administering a three percent saline solution.

Dr. Neilson's testimony regarding the errors of omission and commission indicated what he thought were the departures by the resident and intern from the standard of care, and thus the standard of care applicable to their errors of omission and commission.[9]

---

[7] *Id.*

[8] Before Bahr and Dr. Wizenberg settled, Bahr introduced the videotaped deposition of another expert witness, Dr. Dale Crane. Crane's testimony was directed to Wizenberg's treatment decisions. He also criticized the resident's and intern's treatment. Harper-Grace waived any objection to the foundation for Crane's testimony when it failed to object in that regard at the trial.

[9] Dr. Neilson used the pronoun "they" in describing the persons who committed the acts of omission and commission. "They" did not measure Bahr's blood gas to determine how serious the pneumonia was, and, thus, "they" had no way of knowing how dangerous it was to add fluid or sodium. "They did not evaluate that risk at all."

Neilson was asked to whom he was referring when he said "they." He responded: "The doctors." He was asked: "Which doctors?" He responded: "The house officers who were taking care of the patient."

Dr. Neilson further testified that the resident and intern violated the standard of care in failing to provide for the monitoring of Bahr's reaction to the three percent saline solution either in an intensive care unit or, if a room in an intensive care unit was not available, by adding monitoring equipment in the private room in which he was placed.[10]

Dr. Neilson also testified that the nurses violated the standard of care in failing to monitor Bahr between the last check before 7:00 A.M. and 7:47 A.M. when his personal physician arrived.

A majority of the Court of Appeals said:

> [T]here was no testimony that Dr. Neilson was familiar with the requisite standard of care for interns, residents, and nurses in the Detroit community or similar communities. Although Dr. Neilson testified that he was familiar with the stan-

He was asked: "And that's the intern and resident?" He responded: "That's correct." He continued that they should have administered an arterial blood gas test because that was the only way of knowing whether the patient could tolerate what he was going to be exposed to, and the risk of "drown[ing]." He said:

> If you have inflammation in the lungs and you're given fluid most of that fluid will go to the lung and make it more difficult to breathe and you have to have some way of [assessing] whether you can tolerate the risk or whether the risk is worth taking in the first place. In this case no assessment of risk was made.

[10] Dr. Neilson also testified that it is the intern or resident who makes the decision whether to put a patient in an intensive care unit:

> Well, most of the time in most hospitals, it turns out to be the interns and residents because they're the ones that are there all the time and the patient's private doctor may not be in the hospital at a particular time of the day or night, and that is the reason the hospital provides the interns and residents so that they can be there and be involved and be the eyes and ears of the patient's private doctor. And, so, most of the time these decisions are made by those residents.

dard of care, he did not state what the applicable standard of care was. Dr. Neilson did not state whether interns, residents, and nurses were governed by a local, as opposed to a national, standard.[11]

### B

A party offering the testimony of an expert witness must demonstrate the witness' knowledge of the applicable standard of care.[12] A trial judge's decision finding an expert witness to be qualified is reviewed for abuse of discretion.[13] An expert familiar with the standard of care in a community may testify concerning the standard of care in that community, although he has not practiced in the community.[14] A specialist may testify regarding the conduct of nonspecialists, if he has knowledge of the applicable standard of care.[15]

Dr. Neilson testified to the judge's satisfaction regarding his qualifications and familiarity with the standard of care for residents and interns. He testified that he was familiar with the standard of care applicable to interns and residents on the basis of his own education and practice, and from teaching medicine to residents and interns.

[11] 198 Mich App 34-35.

[12] *Francisco v Parchment Clinic,* 407 Mich 325, 327; 285 NW2d 39 (1979).

In *Haisenleder v Reeder,* 114 Mich App 258, 265; 318 NW2d 634 (1982), the Court of Appeals said "that counsel should clearly elicit that the expert knows the standard and what the standard was before questioning as to what that standard would have required." We read this dicta as an instruction to counsel on how to qualify an expert, and not as a limitation on the judge's exercise of discretion or as controlling review by an appellate court.

[13] *Siirila v Barrios,* 398 Mich 576, 591; 248 NW2d 171 (1976); see also *Mulholland v DEC Int'l,* 432 Mich 395, 402; 443 NW2d 340 (1989); 2 Wigmore, Evidence (Chadbourn rev), § 561, pp 756-759.

[14] *Sampson v Veenboer,* 252 Mich 660, 666-667; 234 NW 170 (1931).

[15] *Siirila, supra* at 590-594.

We agree with the dissenting judge that Dr. Neilson's credentials "were unassailable; his curriculum vitae showed practice experience in areas [Philadelphia] indisputably comparable to the Detroit metropolitan area. He was a teacher of interns and residents in comparable areas."[16] The trial judge did not abuse her discretion in finding that Dr. Neilson was qualified to testify regarding the standard of care applicable to residents and interns.[17]

C

We also agree with the dissenting judge that if there was a critical deficiency regarding the voir dire of Dr. Neilson, it should have been brought to the attention of the judge, and that it appeared that such a "deficiency would have been cured by further direct exploration, because the court was familiar with the applicable standards and, indeed, instructed the jury correctly."[18]

Harper-Grace's lawyer objected to the question what a reasonable and prudent physician or intern or resident would do under the circumstances on the general basis that Dr. Neilson's knowledge of the standard of care had not been shown. The objection was overruled, and Neilson testified that

[16] 198 Mich App 38.

[17] Dr. Neilson did not distinguish between interns and residents educated at the University of Pennsylvania and interning or doing their residencies in Philadelphia and those educated at other medical schools and doing their residencies or internships in hospitals in other large cities.

The assumption that there might be a difference between the standard of care applicable to residents and interns in Detroit and Philadelphia hospitals may be unfounded. There was no evidence suggesting that the standard of care for residents and interns in Detroit was different than the standard for graduates of the University of Pennsylvania or residents and interns in Philadelphia hospitals.

[18] 198 Mich App 38.

he was familiar with the standard of care for interns and residents.[19] Harper-Grace's lawyer declined an opportunity for voir dire concerning Dr. Neilson's qualifications.[20] Other objections did not

---

[19] *Q.* I want you to assume for this next question that when I use the term "standard of care," I mean what a reasonable and prudent physician or intern, resident would do under like or similar circumstances.

*Harper Grace's Lawyer:* Your Honor, I'm going to object, lack of foundation as to this doctor's knowledge of standard of care. It really does not matter what [Bahr's lawyer] thinks standard of care is in this particular case, 'cause he's not the expert.

*Bahr's Lawyer:* Hypothetical question, Your Honor.

*The Court:* You may continue.

*Q.* Assume when I say "standard of care," that's what I mean. With that definition in mind, are you familiar with the standard of care as it existed in 1985 for internists, interns and residents?

*A.* Yes, I am.

[20] The question whether Dr. Neilson had arrived at an opinion "whether the interns, residents, and/or nurses at Harper Hospital complied with or departed from the standard of care as you knew it to exist in 1985, and as I defined it to you in my hypothetical before," was met with the objection:

"I'm going to object, lack of foundation as to the nurses. I don't believe he has been qualified as a nursing expert in this case, and I also further do not believe that he's qualified as to the interns and residents."

The judge asked whether Harper-Grace's lawyer wished to voir dire regarding the doctor's qualifications, and she responded, "No, I don't." The judge said that she was unclear whether Bahr's lawyer had provided a foundation respecting the nurses and suggested further inquiry. "As to interns and residents, I deny the motion."

After Harper-Grace's lawyer declined to voir dire Dr. Neilson regarding his qualifications, and the judge said that she was unclear whether Bahr's lawyer had provided the foundation respecting the nurses, Bahr's lawyer said that he would voir dire Dr. Neilson concerning his familiarity with the standard of care for nurses with regard to carrying out doctors' orders for intravenous administration and monitoring for vital signs. When he concluded, Harper-Grace's lawyer said she would "like to voir dire him on the issue of nurses," and proceeded to do so. The lawyer did not voir dire concerning Dr. Neilson's qualifications respecting residents or interns.

The judge ruled that Dr. Neilson was qualified with regard to the standard of care respecting nurse administration of intravenous fluids, and monitoring for vital signs.

concern Dr. Neilson's qualifications respecting residents or interns.[21]

Harper-Grace did not complain, before Neilson testified about the errors of omission and commission, that there had been no reference to the standard of care for residents and interns in Detroit or similar communities. Nor did it so particularize in its motion for a directed verdict or its motion for judgment notwithstanding the verdict.

Nor, when qualifying its expert witness[22] regarding the standard of care applicable to residents and interns, did Harper-Grace's lawyer or its expert witness particularize whether he was testifying about a standard of care for residents and interns in Detroit or similar communities.

We conclude that the Court of Appeals erred in reversing the judgment entered for Bahr on the basis that Dr. Neilson had not been qualified to testify concerning the standard of care applicable to residents and interns in Detroit and similar communities.

D

Harper-Grace contends that Dr. Neilson, at most, established a prima facie case that the treatment departed from the standard of care applicable to a specialist. Harper-Grace contends that Neilson did not distinguish between a physician or specialist on the one hand, and residents and interns on the other.

Harper-Grace stresses that during the voir dire, Bahr's lawyer inquired whether there was a differ-

---

[21] An inquiry whether Dr. Neilson had attended "national meetings" was met with the objection that this was a leading question. An inquiry whether the file had been sent from someone in the lawyer's office was also met with the objection that it was a leading question.

[22] Who practiced in the Detroit Medical Center area.

ence in the way internal medicine is practiced according to the standard of care depending on geographic location, to which Dr. Neilson responded "within your hypothetical question, not really." Harper-Grace contends that Dr. Neilson was thus being qualified regarding the standard of care applicable to specialists and not residents and interns.

The inference drawn on appeal by Harper-Grace should have been drawn and articulated on the record before the judge ruled shortly thereafter that Dr. Neilson was qualified concerning the standard of care applicable to residents and interns, and may not be urged for the first time long after Dr. Neilson had concluded his testimony. Such an inference is belied by Dr. Neilson's particularized testimony.[23] He testified specifically about the errors of omission and commission of the resident and intern. There was no objection to Dr. Neilson's failure to distinguish more specifically during his testimony. We therefore conclude that the trial judge did not abuse her discretion in permitting Dr. Neilson to testify concerning the standard of care applicable to residents and interns in this case.

III

The Court of Appeals also erred in reversing on the basis of the inadmissible hearsay testimony concerning Dr. Gilroy, a neurologist who examined Bahr after the cardiac arrest. Dr. Gilroy is said to have testified only with respect to what Drs. Clark and Neilson said, namely, that Bahr should have been monitored electronically in a private room, preferably in an intensive care unit. Accordingly,

[23] See ns 9 and 10.

admission of the hearsay statement was not prejudicial error.[24]

Reversed and remanded to the Court of Appeals for further proceedings.

BRICKLEY, C.J., and CAVANAGH, BOYLE, RILEY, and MALLETT, JJ., concurred with LEVIN, J.

WEAVER, J., took no part in the decision of this case.

[24] Bahr's lawyer did not advert to the hearsay statement during closing argument. Harper-Grace adverted to it asking why Bahr had not produced Dr. Gilroy, to which Bahr responded Harper-Grace could have called Gilroy to contradict.