# STATE OF MICHIGAN

# COURT OF APPEALS

BUREAU OF HEALTH CARE SERVICES,

UNPUBLISHED
May 11, 2017

Petitioner-Appellee,

v

No. 332714
Board of Nursing
Disciplinary Subcommittee
LC No. 15-021443

GERARD ANTHONY EICHBAUER, R.N.,
C.R.N.A.,

Respondent-Appellant.

Before: GADOLA, P.J., and JANSEN and SAAD, JJ.

PER CURIAM.

Respondent, a registered nurse (R.N.) and certified registered nurse anesthetist (C.R.N.A.), appeals as of right a ruling by the Board of Nursing Disciplinary Subcommittee (DSC), concluding that respondent violated MCL 333.16221(a) and MCL 333.16221(b)(*i*) of the Public Health Code, MCL 333.1101 *et seq.*, and placing him on probation until he completed three hours of continuing education and paid a $250 fine. We affirm.

## I. BACKGROUND

In October 2014, respondent returned to work as a nurse anesthetist at Henry Ford Health System (HFHS) following a period of medical leave for a knee surgery. Several of respondent's colleagues noticed a change in his appearance and behavior and reported their concerns to hospital management. Cynthia Bendure, a managing nurse anesthetist at HFHS, conducted an audit of respondent's narcotic withdrawal, administration, and wasting records from October to December 2014, and discovered approximately 30 discrepancies. Respondent was ordered to undergo a drug test, which tested positive for Vicodin and Valium. Although respondent had a valid prescription for Vicodin, he did not have a prescription for Valium. After receiving the results of the drug test, HFHS terminated respondent's employment.

In February 2015, petitioner, the Bureau of Health Care Services, filed an administrative complaint against respondent, alleging that he violated MCL 333.16221(a) (authorizing discipline for a violation of general duty) and MCL 333.16221(c)(*iv*) (authorizing discipline for "possessing . . . a controlled substance . . . without lawful authority . . ."). Petitioner also issued an order summarily suspending respondent's nursing license after finding that "the public health, safety, or welfare requires emergency action." Respondent filed a petition to dissolve the

-1-

summary suspension, arguing that petitioner failed to offer any evidence or rationale for its position that respondent was a danger to public health.

At a hearing on respondent's petition, Kim Copeland, a nurse anesthetist at HFHS, testified that on November 26, 2014, respondent reported to work with red eyes and he appeared shaky during the day. Stephanie White-Evans, another nurse anesthetist at HFHS, testified that on November 24, 2014, respondent failed to follow hospital protocol for disposing of a 60-cc syringe of remifentanil. White-Evans said respondent did not appear impaired, but she reported the incident because he failed to properly dispose of a controlled substance. Bendure also testified at the hearing. She explained that each nurse anesthetist is given a box of narcotics at the beginning of a shift and must record any drugs administered to patients on an electronic patient chart in a computer system called EPIC. Then, if there are any unused drugs following a procedure, the nurse anesthetist must waste the drugs and document the waste on a pharmacy sheet. Bendure said she did not know what happened to the drugs respondent failed to properly document, but she agreed that mistakes on a pharmacy sheet do not necessarily indicate that someone is diverting medication.

Following the hearing, the ALJ concluded that sufficient evidence was not produced to show that respondent was a danger to public health and thus dissolved the summary suspension. Petitioner then filed an amended complaint, dropping the allegation that respondent violated MCL 333.16221(c)(*iv*) for possessing a controlled substance without lawful authority and adding an allegation that respondent violated MCL 333.1622(b)(*i*) for "incompetence."

At a hearing on the administrative complaint, nurse anesthetist Susan Trout testified that she records any drugs administered to a patient during a procedure on EPIC, then, at the end of the procedure, she reviews EPIC to tally up what drugs are remaining and wastes those drugs in the presence of another nurse who signs the pharmacy sheet after witnessing the waste. Trout said she had to call respondent on two occasions after he returned from medical leave because his electronic patient charts and pharmacy sheets "didn't add up." She testified that "nothing was missing," but that respondent's recording was "sloppy."

Rita Haynes, a pharmacist at HFHS, testified that she reviews pharmacy sheets returned by nurse anesthetists to see what drugs were administered and wasted, and to ensure that the anesthetists tallied the numbers correctly. She explained that she only compares the numbers submitted on the pharmacy sheets with the EPIC charts "if the numbers don't balance." Haynes testified that respondent's recording practices were "quite sloppy and needed to be corrected often," but she never encountered a situation in which drugs were missing and never believed the errors were significant enough to report.

Claude Johnson, a nurse anesthetist manager at HFHS, was qualified as an expert regarding the standard of care. He explained that HFHS protocol requires nurse anesthetists to document any drugs administered on a patient's electronic chart, then to document the wasting of any remaining drugs in the presence of a witness before marking it and obtaining the witness's signature on a pharmacy sheet. Johnson testified that the standard of care applicable to nurse anesthetists required them to document the wasting of any controlled substances, and at HFHS, anesthetists documented that waste on pharmacy sheets.

Respondent called Robert Shovan, a nurse anesthetist at HFHS, who testified that there are inherent complications associated with properly recording the amount of remifentanil administered through an infusion pump because the amount could be increased or decreased depending on a patient's blood pressure or heart rate. He explained that, at the beginning of a procedure, nurse anesthetists calculate the amount that they think will be administered and input that calculation into EPIC. Then, he said, they must "guess how much [they]'ve pushed into the patient during the procedure that was in excess of that calculation or less than that calculation."

Shovan testified that documenting waste was not part of the standard of care applicable to nurse anesthetists. When asked if he "believe[d] that errors on that sort of sheet constitute[d] incompetence," Shovan responded, "No. If that's the case, there would probably be 65, 75 percent within the community." Shovan testified that it was his understanding that 20 out of 25 people in his department had "been warned about their issues with narcotics counts" after EPIC was introduced. When asked, however, whether "a nurse has a general duty to account for the narcotics that he is entrusted with during his shift," Shovan answered, "Yes."

In September 2015, the ALJ issued a proposal for decision, concluding that petitioner failed to establish that respondent violated MCL 333.16221(a) or MCL 333.16221(b)(*i*) because there were no "benchmarks offered to determine whether the discrepancies in Respondent's charting constituted a failure to meet minimal standards of acceptable prevailing practice." In March 2016, the DSC issued a decision disagreeing with the ALJ's legal determinations. The DSC concluded that respondent's "repeated failure to accurately document the wasting of controlled substances is a violation of general duty," and the standard of care required "a nurse anesthetist to accurately document the administration and wasting of controlled substances."

## II. STANDARD OF REVIEW

Judicial review of a ruling issued by a disciplinary subcommittee under the Public Health Code is limited to that set forth in Const 1963, art 6, § 28. *Dep't of Community Health v Risch*, 274 Mich App 365, 371; 733 NW2d 403 (2007). Const 1963, art 6, § 28 states the following:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

Consequently, we must determine whether the DSC's ruling in this case was "supported by competent, material and substantial evidence on the whole record." *Risch*, 274 Mich App at 371.

## III. DISCUSSION

When reviewing whether an agency's ruling was supported by competent, material, and substantial evidence on the whole record, we consider the record in its entirety, not merely the portions supporting the agency's findings and conclusions. *Risch*, 274 Mich App at 372, citing

*VanZandt v State Employees' Retirement Sys*, 266 Mich App 579, 588; 701 NW2d 214 (2005). " 'Substantial evidence' is evidence that a reasonable person would accept as sufficient to support a conclusion. While this requires more than a scintilla of evidence, it may be substantially less than a preponderance." *Dowerk v Oxford Twp*, 233 Mich App 62, 72; 592 NW2d 724 (1998). We will not disturb administrative findings of fact or conclusions of law that required the agency to assess witness credibility or to resolve conflicts in the evidence. *Risch*, 274 Mich App at 372. "A reviewing court may not set aside factual findings supported by the evidence merely because alternative findings could also have been supported by evidence on the record or because the court might have reached a different result." *Id.* at 373.

## A. STANDARD OF CARE

Respondent first argues that petitioner failed to establish the relevant standard of care or that he breached the standard of care. Specifically, respondent contends that Johnson established the standard of care by impermissibly relying on the internal operating policies of HFHS, that petitioner failed to show what the standard practice was for nurse anesthetists in the local community, that Johnson did not testify that the standard of care required perfect accuracy, and that none of respondent's narcotics were reported as missing.

Respondent is correct that "internal policies of an institution, including a hospital, cannot be used to establish a legal duty in a negligence claim." *Zdrojewski v Murphy*, 254 Mich App 50, 62; 657 NW2d 721 (2002). Johnson provided the following testimony regarding the applicable standard of care:

> *Hudson* (Counsel for petitioner). Mr. Johnson, . . . when you have medication that is not administered to the patient that should be wasted, does a nurse—does the standard of care call for a CRNA to document that waste?
>
> *Johnson*. Yes, it does.
>
> *Hudson*. Okay. At your facility where would waste be documented?
>
> *Johnson*. On the pharmacy record.
>
> *Hudson*. Okay. So if we apply the standard of care to this system that we have, then we should be seeing waste documented on the pharmacy sheets if there's a discrepancy between what was administered on the pharmacy sheet and what was administered in EPIC?
>
> *Johnson*. That's correct.

Johnson further clarified his standard-of-care testimony on cross-examination:

> *Chapman* (Counsel for respondent). Okay. Now, let's talk about the documentation of waste. . . . They require this pharmacy box, but that's not the way that every facility requires waste documentation; right?
>
> *Johnson*. The policy—the waste documentation, the pharmacy sheet—

*Chapman*. Yes.

*Johnson*. —it's standard.

*Chapman*. It's standard in every facility?

*Johnson*. The sheet might look different but it's standard that you—patient's name is on there, medical record number—

*Chapman*. Okay.

*Johnson*. —what you administer, what you're wasting [inaudible].

*Chapman*. So it's standard across the United States in every facility?

*Johnson*. That you have to have administration, waste and signature.

Johnson testified that the standard of care required nurse anesthetists to document the wasting of controlled substances. He did not testify that the standard of care required documenting the waste on the specific pharmacy sheets used by HFHS. Therefore, respondent's contention that Johnson relied solely on an internal hospital policy to establish the standard of care misconstrues Johnson's testimony.

Respondent's witness, Shovan, also testified that a nurse has a general duty to account for the narcotics that he is entrusted with during his shift. Bendure testified that she discovered approximately 30 discrepancies in respondent's documentation of the wasting of controlled substances during her audit of his records. In several of these instances, respondent failed to account for whole units of medication that he was given at the beginning of his shift. This evidence was sufficient to allow a reasonable person to accept the DSC's conclusion that respondent violated a general duty and failed to conform to minimal standards of acceptable practice. See *Dowerk*, 233 Mich App at 72; MCL 333.16221(a) and (b)(*i*).

Respondent argues that Johnson "never stated what the practice was for nurses in the local community." Generally, the common-law standard of care applies to nurses, which measures the standard of care by the "skill and care ordinarily possessed and exercised by practitioners of the profession in the same or similar localities." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 492; 668 NW2d 402 (2003). "Expert testimony is necessary to establish the standard of care . . . ." *Id.* As a managing nurse anesthetist at HFHS, the very health system in which respondent worked, Johnson was clearly familiar with the requisite standard of care applicable to nurse anesthetists in his own local community and was therefore qualified to testify regarding the applicable standard of care. See *Bahr v Harper-Grace Hosps*, 448 Mich 135, 139, 142; 528 NW2d 170 (1995) (holding that an expert who did not explicitly testify that he was familiar with the standard of care in the Detroit metropolitan area was nonetheless qualified to testify regarding the applicable standard of care because he had "practice experience in areas [Philadelphia] indisputably comparable").

Respondent also argues that evidence at the hearing showed that most of the nurse anesthetists in his department were warned about improper narcotic documentation, so the

standard of care could not have required perfect accuracy. The record does contain some evidence that other nurse anesthetists at HFHS may not have maintained perfect records. Specifically, when asked if he "believe[d] that errors on that sort of sheet constitute[d] incompetence," Shovan responded, "No. If that's the case, there would probably be 65, 75 percent within the community." Shovan further testified that it was his understanding that 20 out of 25 people in his department had "been warned about their issues with narcotics counts." Bendure also testified that she called the other nurse anesthetists after respondent's termination to clarify HFHS's policies because she did not want anyone else to make the same mistakes and thought it was "very possible" that such mistakes could happen.

Shovan did not explain what mistakes were common on pharmacy sheets that he believed plagued 65 to 75 percent of his relevant professional community and he did not explain what the "issues with narcotics counts" were that affected 20 of the 25 nurse anesthetists in his department. Further, although Bendure testified that it was "very possible" that other nurse anesthetists could make similar documentation mistakes, she did not testify that such mistakes occurred with the same frequency or magnitude as the errors shown in respondent's records. Therefore, respondent has not shown that Johnson's standard of care testimony failed to reflect the skill and care ordinarily possessed and exercised by practitioners of the profession in his community. See *Wiley*, 257 Mich App at 492.

Respondent argues that the standard of care provided by Johnson was unreasonable because Shovan testified that there are "wide variances in accuracy in the amounts of certain drugs administered via an IV pump . . . ." However, Shovan's testimony only pertained to remifentanil, and several of respondent's improper wasting records involved other drugs, such as midazolam. There was also competing testimony provided by Trout, who stated that she never had an issue with EPIC inaccurately recording the amounts of remifentanil pushed through an infusion pump. We will not disturb administrative findings of fact or conclusions of law that required the agency to resolve conflicts in evidence. *Risch*, 274 Mich App at 372.

Finally, respondent argues that no drugs were ever reported missing from his narcotics box. Although respondent was not accused of diverting medication, Bendure explained that, in the incidents she uncovered during her audit, she did not know what happened to the leftover drugs because respondent did not properly document the waste. More importantly, the ultimate fate of the unaccounted for drugs is irrelevant to a determination of whether respondent breached the standard of care set forth by Johnson regarding the need to properly document any waste. Accordingly, respondent has not shown that the DSC's ruling was unsupported "by competent, material and substantial evidence on the whole record." *Risch*, 274 Mich App at 371.

## B. CROSS-EXAMINATION

Respondent next argues that the ALJ erred by limiting his cross-examination of Johnson concerning his standard of care testimony. We disagree.

Proceedings under the Public Health Code are governed by the Administrative Procedures Act (APA), MCL 24.201 *et seq*., and MCL 24.275 of the APA sets forth the rules of evidence in a contested case hearing. See *Mich Electric Coop v Pub Serv Comm*, 267 Mich App 608, 623; 705 NW2d 709 (2005). MCL 24.275 provides that, in a contested case, the rules of

evidence "shall be followed as far as practicable[.]" "Irrelevant, immaterial or unduly repetitious evidence may be excluded." *Id.* Michigan Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

As demonstrated by the testimony discussed earlier in this opinion, Johnson testified that the standard of care required nurse anesthetists to document the wasting of controlled substances, not that it required documenting the waste on the specific pharmacy sheets used by HFHS. Nonetheless, during cross-examination, respondent's counsel asked several questions insinuating that the standard of care required documentation on the HFHS pharmacy sheets.

> *Chapman* (Counsel for respondent). Did you bring any documentation with you today that shows that the standard of care requires documentation on a pharmacy sheet?
>
> *Johnson*. I'm not sure I understand.
>
> *Chapman*. Did you bring any documentation today that shows that the standard of care requires documentation on the pharmacy sheet?
>
> *Johnson*. Only what we have at our institution.
>
> *Chapman*. So you have an institutional policy that says that that's what you do?
>
> *Johnson*. [Inaudible] policy.
>
> *Chapman*. You don't have it with you, but there is a policy that exists that says that's what you do?
>
> *Johnson*. Yes.
>
> *Chapman*. Do you know the policy number?
>
> *Johnson*. No.

Petitioner's counsel objected on relevancy grounds. The trial court upheld the objection after concluding that the specifics of HFHS's policy, such as the policy number establishing the use of pharmacy sheets, was not relevant to the standard of care. However, respondent's counsel then continued the same line of questioning: "In generating that opinion regarding the standard of care being recorded on the pharmacy sheet, what information did you derive that opinion on?" Petitioner's counsel again objected, arguing that the question mischaracterized Johnson's testimony. The ALJ then engaged in the following discussion with respondent's counsel:

> *The ALJ*. [Y]ou are correct in assuming I'm not allowing you to go into qualifications regarding where he's getting the standard of care for this line of questioning. I think it's been established on the record of the whole case because

-7-

we've had testimony that supports the conclusion that there has to be consistent records and checks for what happens to controlled substances within a facility . . . it's a common sense thing. You've got to record it and keep track of it, and that's what we've basically been hearing from witness after witness.

    *Chapman*. Your Honor, my last question was what are the facts that created the opinion that documenting on this form is the standard of care, and that question was the one that was objected to, and—

    *The ALJ*. Okay. Well, here's my problem, is that if you're just talking— because, I mean, he's just established that different facilities may have different forms, but the bottom line is this has to be documented. Documented to me means written down on something. . . .

* * *

    *Chapman*. So you're not—you're not permitting me to inquire into the basis of his knowledge regarding the standard of care; is that what you're saying?

    *The ALJ*. As it relates to the pharmacy form in this facility.

The ALJ limited the cross-examination of respondent's counsel only as it pertained to his insinuation that Johnson testified that the standard of care required documentation on the pharmacy sheets used by HFHS. It is clear from the line of questioning pursued by respondent's counsel that he misconstrued Johnson's testimony. Therefore, the ALJ did not err by limiting this line of questioning and concluding that any evidence elicited in response would not be relevant to the issues presented.

    Affirmed.

                              /s/ Michael F. Gadola
                              /s/ Kathleen Jansen
                              /s/ Henry William Saad