*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RONALD J. KOWALSKI, as Personal
Representative of the ESTATE OF ANDREW
KOWALSKI,

     Plaintiff-Appellee/Cross-Appellant,

v

PRIME HEALTHCARE SERVICES GARDEN
CITY, LLC,

     Defendant-Appellant/Cross-Appellee,

and

DR. RONALD KATTOO,

     Defendant.

UNPUBLISHED
April 11, 2024

No. 366373
Wayne Circuit Court
LC No. 21-011019-NH

Before: CAVANAGH, P.J., and K. F. KELLY and RICK, JJ.

PER CURIAM.

In this medical malpractice case, defendant Prime Healthcare Services Garden City, LLC, ("PHS") appeals by delayed leave granted[1] the trial court's order denying its motion for summary disposition under MCR 2.116(C)(10) on the issue of whether PHS was vicariously liable for the death of the decedent, Andrew Kowalski. Plaintiff has also cross-appealed the trial court's order granting PHS's motion for summary disposition under MCR 2.116(C)(10) on the issue of whether unnamed hospital staff were also liable for the decedent's death. Finding no errors warranting reversal, we affirm the trial court's order and remand for further proceedings consistent with this opinion.

---

[1] *Kowalski Estate v Prime Healthcare Servs Garden City, LLC*, unpublished order of the Court of Appeals, entered July 31, 2023 (Docket No. 366373).

## I. BASIC FACTS AND PROCEDURAL HISTORY

In 2018, the decedent began experiencing pain in his left knee. After consultation with his orthopedic doctor, Dr. Paul Drouillard, the decedent was scheduled to have a left total knee replacement surgery on February 11, 2019, at Garden City Hospital. Dr. Drouillard successfully performed the surgery; however, the decedent experienced a decline in pulmonary status while in recovery and was transferred to the intensive care unit ("ICU") on February 12, 2019.

In the ICU, the decedent was placed under the care of defendant Dr. Ronald Kattoo, the director of "Unit 2" of the ICU. Dr. Kattoo was not an employee of PHS, but rather was engaged by PHS through a contract with Pulmonary & Sleep Medicine, P.C. On March 3, 2019, Dr. Kattoo approved the transfer of the decedent from the ICU to a general medical floor that was also supervised by Dr. Kattoo. On March 5, 2019, the decedent was found in his hospital bed without a heartbeat and expired.

Plaintiff filed a complaint against defendants asserting that had the decedent "been in the ICU[,] his respiratory and cardiac status could have been more closely monitored and timely treatment instituted to either prevent the cardiac arrest or allow for there to have been successful resuscitation." As relevant here, the complaint sought to hold PHS vicariously liable for the negligent acts of its agents, namely Dr. Kattoo and the other ICU staff, who plaintiff claimed did not properly monitor and treat the decedent.

In two separate motions, PHS sought summary disposition of plaintiff's claims. Concerning Dr. Kattoo, PHS argued that plaintiff failed to show that Dr. Kattoo was an agent of PHS because he was not employed by the hospital and the decedent acknowledged some doctors were not employees when he signed his consent for treatment form before his knee surgery. Accordingly, PHS argued that it dispelled any belief the decedent may have had about Dr. Kattoo's employment by signing the form. With respect to the other ICU staff, who were not named in the complaint, PHS argued that plaintiff's standard-of-care expert, Dr. Ian Newmark, limited his criticisms to Dr. Kattoo, and plaintiff, therefore, could not support a claim against the other staff.

The trial court did not hold a hearing, and issued an order denying PHS's motion concerning Dr. Kattoo but granting it as to the other ICU staff. PHS filed a delayed application for leave to appeal the trial court's denial of its motion concerning Dr. Kattoo, which this Court granted. *Kowalski Estate v Prime Healthcare Servs Garden City, LLC*, unpublished order of the Court of Appeals, entered July 31, 2023 (Docket No. 366373). Plaintiff subsequently filed his claim of appeal concerning the other ICU staff, and this appeal followed.

## II. STANDARDS OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 506; 991 NW2d 230 (2022). Under MCR 2.116(C)(10), summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." When deciding a motion for summary disposition under MCR 2.116(C)(10), the trial court must consider the "affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party

opposing the motion." *Williamson v AAA of Mich*, 343 Mich App 496, 502-503; 997 NW2d 296 (2022) (quotation marks and citations omitted).

## III. VICARIOUS LIABILITY AND OSTENSIBLE AGENCY

On appeal, PHS argues that the trial court erred when it denied PHS's motion for summary disposition because the evidence demonstrated there was no genuine issue of fact that Dr. Kattoo was not an agent of PHS. We disagree.

Vicarious liability "is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other." *Lee v Detroit Med Ctr*, 285 Mich App 51, 65; 775 NW2d 326 (2009). The principle is, in other words, that "a master is responsible for the wrongful acts of his servant committed while performing some duty within the scope of his employment." *Rogers v JB Hunt Transp, Inc*, 466 Mich 645, 651; 649 NW2d 23 (2002) (quotation marks and citation omitted).

Hospitals are generally not liable for the negligence of the acts of its independent contractors. *Grewe v Mt Clemens General Hosp*, 404 Mich 240, 250; 273 NW2d 429 (1978). A hospital may be liable, however, if the plaintiff can show the following elements:

> "[First] The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; [second] such belief must be generated by some act or neglect of the principal sought to be charged; [third] and the third person relying on the agent's apparent authority must not be guilty of negligence." [*Markel v William Beaumont Hosp*, ___ Mich ___; 982 NW2d 151 (2022), slip op at 1, quoting *Grewe*, 404 Mich at 253 (quotation marks and citations omitted; alterations in original).]

In *Markel*, ___ Mich at ___; slip op at 1, the Michigan Supreme Court clarified *Grewe*, stating that the central issue is whether the plaintiff "looked to" the hospital for care and treatment and not merely the location where the plaintiff's physician selected. "A relevant factor in this determination  involves resolution of the question of whether the hospital provided the plaintiff with [the doctor] or whether the plaintiff and [the doctor] had a patient-physician relationship independent of the hospital setting." *Grewe*, 404 Mich at 251. The plaintiff bears the burden to demonstrate the existence of the agency relationship. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 12; 651 NW2d 356 (2002).

There is no dispute in this case that Dr. Kattoo was not an employee of PHS, and plaintiff's ability to demonstrate an agency relationship between Dr. Kattoo and PHS thus depends upon the establishment of an ostensible agency relationship. See *Grewe*, 404 Mich at 252 ("An agency is ostensible when the principal intentionally or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him.") (quotation marks and citation omitted). Moreover, there is also no dispute that before the decedent was placed in the ICU, the decedent had no preexisting relationship with Dr. Kattoo. PHS argues, however, that because the decedent's initial contact with Garden City Hospital was for an elective surgery with his own orthopedic doctor, the decedent did not "look to" the hospital for treatment. This argument ignores,

however, that while the decedent may not have initially looked to Garden City Hospital for treatment, once his medical prognosis worsened, he was placed in the hospital's ICU. The ICU was not simply the location chosen by the decedent's physician, but rather the most logical location for care and treatment given the decedent's critical status.

PHS also relies on the fact that unlike in *Grewe*, the hospital did "something" to dispel a belief by the decedent that Dr. Kattoo was its employee by having the decedent sign a consent form. PHS argues that the form, which states, "[s]ome doctors and staff are not employees of Garden City Hospital," and that Garden City Hospital "is not responsible for their actions," had the legal effect of removing any liability for the acts of PHS's independent contractors because it put patients on notice that its doctors may not be its employees. We disagree.

In *Stempniak v Prime Health Servs Garden City, LLC*, unpublished per curiam opinion of the Court of Appeals, issued July 27, 2023 (Docket No. 361018),[2] the Court addressed identical language used by PHS and considered whether it was sufficient under *Markel* to dispel a patient's belief about agency. The Court stated:

> In this case, Garden City Hospital asserts that the record establishes that it affirmatively acted to inform Stempniak that some of the physicians were not its employees when it provided her with a consent form that she signed before the surgery. The two-page "consent for treatment" form, in a section titled, "I understand that," provided:
>
> > Some doctors and staff are not employees of Garden City Hospital. I know that Garden City Hospital is not responsible for their actions. I also know I may receive separate bills from them even though they provide services to me at Garden City Hospital. I will work with their offices to answer questions about my insurance.
>
> While the above language arguably informed Stempniak that "some" doctors and staff were not employees of Garden City Hospital, it did not provide her with any information regarding Dr. Gross's employment status. Further, Stempniak testified that she had no memory of signing the form, no memory of whether its contents were explained to her, and no understanding of what it meant because she was in significant pain at the time that she signed it. Stempniak explained, "I was in so much pain I would have signed anything that I thought was going to help me get rid of the pain." Viewing the evidence in the light most favorable to Stempniak as the non-moving party, we find that there is a genuine issue of material fact whether Stempniak had a reasonable belief that Gross was an agent of the hospital and thus affirm the trial court's denial of the hospital's motion for summary disposition. [*Stempniak*, unpub op at 4-5.]

---

[2] Unpublished cases are not binding on this Court but may be considered for their persuasiveness. *Eddington v Torrez*, 311 Mich App 19203; 874 NW2d 394 (2015).

Similarly here, the consent form the decedent signed put him on notice that *some* doctors may not be employees of Garden City Hospital, but did not inform him of Dr. Kattoo's status. This is particularly relevant where here, Dr. Kattoo was not "just" a physician working in the hospital, but the director of the ICU itself, which he described as his "team." Dr. Kattoo's conduct while the decedent was in his care did nothing to dispel any belief about his agency and, quite the opposite, bolstered it. Dr. Kattoo's responsibilities included training the hospital's residents, whom he brought into the decedent's hospital room to observe as part of their training. Dr. Kattoo also explained to plaintiff that he was in charge of and supervising the decedent's care, and had the authority to transfer the decedent to a different unit within the hospital, which he also oversaw. In sum, no reasonable patient would believe that the director of the ICU, with power to make transfer decisions within other departments in the hospital, was not an employee of the hospital simply because the patient was informed that "[s]ome doctors and staff are not employees . . . ."

PHS urges the Court to follow *Grzywacz v Hidalgo, MD*, unpublished per curiam opinion of the Court of Appeals, issued June 29, 2023 (Docket Nos. 360424 & 361005), which it contends is dispositive of the issue because, as in this case, the hospital in *Grzywacz* successfully defended itself against a claim of vicarious liability on the basis of a consent form. While it is true that the Court in *Grzywacz* relied on the hospital's consent form when affirming the trial court's summary disposition order, critical to the Court's analysis was the fact that in that case, none of the doctors were "offered" to the patient; one of the defendant-doctors was an on-call cardiologist from the patient's primary care physician's practice, and the other doctor was the on-call neurologist at the hospital who was brought in by the cardiologist. *Grzywacz*, unpub op at 6. With respect to the neurologist, the most similarly situated doctor to Dr. Kattoo here, the Court noted that "nothing implied" that the doctor was an agent of the hospital. *Id*. In contrast here, Dr. Kattoo held himself out as the leader of a "team" in the ICU for which he had supervisory control over residents and patients and their direction of care.

In sum, the trial court did not err when it denied PHS's motion for summary disposition on the issue of ostensible agency. The patient consent form did not clearly inform the decedent that Dr. Kattoo was not an employee of the hospital, which is especially true where Dr. Kattoo took affirmative steps to imply that he was.

III. OTHER HOSPITAL STAFF

On cross-appeal, plaintiff argues the trial court erred when it granted PHS's motion for summary disposition concerning the other ICU staff because Dr. Newmark, his standard-of-care expert, included those individuals in his criticisms of the breaches of the standard of care. We disagree.

A plaintiff in a medical malpractice case must show: "(1) the applicable standard of care, (2) a breach of that standard by the defendant, (3) an injury, and (4) proximate causation between the alleged breach of duty and the injury." *Rock v Crocker*, 499 Mich 247, 255; 884 NW2d 227 (2016). "[T]he plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." MCL 600.2912a(b)(2). Expert testimony is generally required in a medical malpractice case "in order to establish the applicable standard of care and to demonstrate that the professional breached that standard." *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). Such testimony is required

because "the ordinary layperson is not equipped by common knowledge and experience to judge the skill and competence of the service and determine whether it meets the standard of practice in the community." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 492; 668 NW2d 402 (2003). The expert's testimony cannot be made on the basis of speculation and there must be "facts in evidence to support the opinion testimony of an expert." *Gonzalez v St John Hosp & Med Ctr (On Reconsideration)*, 275 Mich App 290, 294-295; 739 NW2d 392 (2007).

Dr. Newmark, plaintiff's standard-of-care expert, testified in deposition regarding his opinions regarding the circumstances that caused the decedent's death. PHS contends that Dr. Newmark limited his testimony to the actions of Dr. Kattoo, specifically pointing to the following colloquy:

> *Q*. Do you have any other standard of care criticisms other than the elective intubation and he should not have been transferred on March 3?
>
> *A*. No, sir.
>
> *Q*. Is it correct that your standard of care criticisms are directed at the ICU attending Dr. Kattoo?
>
> *A*. That's correct.

Plaintiff insists, however, that Dr. Newmark's criticisms were not so limited and that his testimony, in conjunction with Dr. Kattoo's testimony, demonstrates that the ICU staff was responsible for intubation of the decedent, which did not occur. It is true that Dr. Newmark testified that the failure to intubate the decedent breached the standard of care. For example, Dr. Newmark testified that when the decedent "was showing signs of deterioration . . . he would have benefitted from being selectively intubated at that time and put into the ICU." Dr. Newmark also stated that intubating the decedent "would have prevented him from having his arrest and dying." When coupled with Dr. Kattoo's testimony that the responsibility for intubation was shared among the ICU staff, plaintiff contends the testimony was sufficient to support his claim.

Dr. Newmark's testimony never specifically identified unnamed ICU staff as being responsible for failing to intubate the decedent. Regardless of how plaintiff attempts to frame his testimony, Dr. Newmark did not state that such individuals were responsible. Indeed, Dr. Newmark was directly asked if his standard-of-care criticisms, including those concerning intubation, were solely leveled at Dr. Kattoo, to which he responded, "That's correct."

Plaintiff's reliance on *Bahr v Harper-Grace Hosps*, 448 Mich 135; 528 NW2d 170 (1995), is misplaced. In that case, the Michigan Supreme Court partially reversed this Court's decision to remand the plaintiff's medical malpractice case for a new trial on the basis that the plaintiff did not adequately support her expert testimony for her claims against the defendant-hospital's residents, interns, and nurses. *Bahr*, 448 Mich at 136-137. Unlike this case, however, the issue before the Michigan Supreme Court was whether the plaintiff's expert was *qualified* to testify regarding the standard of care for residents, interns, and nurses. See *id*. at 141. There is no similar challenge in this case to Dr. Newmark's qualifications, and we do not interpret *Bahr* as standing for the proposition that expert testimony regarding residents and interns is always relevant and admissible.

Indeed, in *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 15; 651 NW2d 356 (2002), the Michigan Supreme Court held that "in order to find a hospital liable on a vicarious liability theory, the jury must be instructed regarding the specific agents against whom negligence is alleged and the standard of care applicable to each agent." Neither plaintiff nor Dr. Newmark identified any "specific agent" apart from Dr. Kattoo. Accordingly, the trial court did not err when it granted PHS's motion for summary disposition on the issue of unnamed ICU staff.

Affirmed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Neither party having prevailed in full, no costs may be taxed. MCR 7.219(A).

/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly
/s/ Michelle M. Rick